## NATIONAL LABOR RELATIONS BOARD v. MARTIN BROS. BOX CO.
### No. 7919.

Circuit Court of Appeals, Seventh Circuit.

June 23, 1942.

Rehearing Denied July 9, 1942.

Writ of Certiorari Denied Oct. 12, 1942.

See —— U.S. ——, 63 S.Ct. 59, 87 L.Ed. ——.

Arthur Donovan, Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Ruth Weyand and Allan R. Rosenberg, all of Washington, D. C., for petitioner.

Nolan Boggs, Bruce Winchester, Howard W. Boggs, and Boggs & Winchester, all of Toledo, Ohio, for respondent.

Before EVANS, KERNER, and MIN-TON, Circuit Judges.

KERNER, Circuit Judge.

In this case the National Labor Relations Board found that the respondent, by interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed them by § 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, had engaged in unfair labor practices, had discouraged membership in a labor union, and had refused upon request to bargain collectively with the union in violation of § 8(1) (3) and (5) of the Act, 29 U.S.C.A. § 158(1, 3, and 5). Upon these findings the Board ordered respondent to cease and desist from the unfair labor practices, to reinstate with back pay the two employees against whom it had discriminated, and upon request, to bargain collectively with the union. No jurisdictional issue is involved. The questions for our decision are whether the findings are sustained by substantial evidence and whether the order is valid.

Respondent is engaged in the manufacture and sale of corrugated containers. In June, 1938, respondent's employees formed the Aurora Corrugated Box Workers' Union and elected Alvin McDaniel as president who, in August, submitted to respondent a proposed contract. In October and November a bargaining committee, headed by McDaniel, held four conferences with Fred J. Martin Jr., respondent's president. At the conference held on November 11 or 12, Martin suggested that the contract include a clause

maintaining for the following year the minimum wage scale then in effect. The suggestion was rejected by the committee. November 18, Martin called and presided at a meeting of all the employees and, after informing them that a contract was necessary for their protection and that the union representatives did not understand the situation, stated: "What if you didn't have a contract and I suddenly sold this place of business and some Jew would come in? He could cut your wages to a quarter an hour." At this meeting Martin called upon McDaniel to sign the contract, and when McDaniel refused, on the ground that the meeting was not an official union meeting, Martin told the employees that McDaniel was "a damn poor president and they ought to elect a new one."

█ The Board found that by calling the mass meeting of November 18, at which it [respondent] criticized the activities of the union's bargaining committee and the union's president, suggested the union elect another president, and urged its employees to vote favorably upon the contract submitted to them by it while failing to deal with the employees' chosen representatives, respondent violated § 8(1) of the Act. Respondent contends that Martin's actions at this meeting did not constitute interference, restraint, or coercion of the employees in the exercise of their right of self-organization, and that the finding of the Board is not supported by substantial evidence. With this contention we are unable to agree.

█ It was respondent's duty to negotiate with the union's committee only, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 44, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and Virginian Railway v. System Federation, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789, rather than to appeal to the membership as a whole, and the question of what inference should be drawn from the evidence, is a function that belongs to the Board. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, and National Labor Relations Board v. Waterman, etc., Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704. From the whole record, we are of the opinion that the Board was justified in finding that the respondent violated § 8(1)

of the Act, National Labor Relations Board v. Vincennes Steel Corp., 7 Cir., 117 F.2d 169; National Labor Relations Board v. Superior Tanning Co., 7 Cir., 117 F.2d 881; and National Labor Relations Board v. Stone, 7 Cir., 125 F.2d 752, 755, since Martin's conduct was calculated to undermine the position taken by the bargaining committee during the negotiations and to destroy its prestige with the union. Such attempts by an employer to impose his will upon his employees have been condemned, National Labor Relations Board v. Jahn & Ollier Engraving Co., 7 Cir., 123 F.2d 589; National Labor Relations Board v. W. A. Jones, etc., Co., 7 Cir., 123 F.2d 552, and our conclusion is none the less valid because a majority of the union employees voted to accept the contract as proposed.

We now pass to the question of the discriminatory discharges. The Board found that McDaniel was discharged because of his union activities and that Charles C. Huff was discharged because he was a union member identified with and sympathetic toward the attitude of McDaniel. Respondent, however, contends that the discharge of these employees had no relationship to their union affiliations or activities.

McDaniel was president of the union and chairman of its grievance committee. He had been in respondent's employ as an electrician for about seven years and his services were satisfactory. He was discharged by Martin on August 30, 1939.

It appears that after the execution of the contract of November 18, 1938, numerous grievances were presented to respondent by the union through McDaniel, that these were amicably adjusted, and that during that period Martin and McDaniel were very friendly. In August, 1939, McDaniel complained that the respondent had permitted certain salaried employees to do production work, to the detriment of union members who were paid on a production basis. Martin, on August 11, rejected the complaint. During the same month another grievance arose. It involved the complaint of two die makers that their wages had been reduced. Martin rejected the complaint, and the record shows that the committee refused to accept his decision. On August 25 McDaniel, without submitting the letter to the union, wrote[1] to William Selz,

---

[1] Dear Bill:

It has happened, The complaint that I mentioned in my letter of yesterday.

The standing committees were called

into a meeting today and official notified that the matter was taken out of the hands of the officials at the plant by Martin.

the union's International representative, and gave a copy thereof to respondent's local superintendent, who mailed it to Martin at Toledo, Ohio. Upon receipt of the letter Martin, on August 30, drove to Aurora and called a meeting of all the employees. At this meeting Martin announced that he was a doomed man, convicted and sentenced by McDaniel, and he read the letter to those assembled, interspersing his reading with an explanation of his rejection of the die workers' grievance and with such comments as that McDaniel had been reading cheap, atheistic, communistic and Nazi literature; that unionism had gone to McDaniel's head; and that if the employees did not demand and accept McDaniel's resignation, they would be locked out of the plant the next morning. He called for a show of hands as to whether the employees knew anything about the letter and when no one raised his hand, he announced McDaniel's discharge for sending the letter, because he [Martin] considered it as a threat upon his life. McDaniel testified that he meant to threaten a strike.

The Board found that McDaniel was an intolerable obstacle to respondent's domination of labor relations at the plant; that Martin was irked by McDaniel's continued active interest in the grievance of the die setters; that there was nothing in the past relationship between Martin and McDaniel indicating that McDaniel was a man of violent disposition; that the last paragraph of the letter, when considered in its context, could be taken as a threat to call a strike if the existing controversy concerning the allocation of time for setting the dies was not satisfactorily settled, and concluded that McDaniel was discharged, not because of any fancied threat of death, but because the respondent objected to McDaniel's action in protesting Martin's decision on the die workers' grievance.

Under this state of the record, we cannot say that the Board erred in its conclusion that McDaniel was in fact discharged because of his union activities, since it has recently been held (Supreme Court, April 27, 1942) that the possibility of drawing either of two inconsistent inferences from the evidence does not prevent the Board from drawing one of them. National Labor Relations Board v. Nevada Consolidated Copper Corporation, 62 S.Ct. 960, 86 L.Ed. ——.

Huff, a boiler fireman who had been employed by respondent since 1936, was discharged on September 2, 1939. He was a charter member of the union, a member of its shop safety committee, and had voted with McDaniel to reject the 1938 contract. On August 31, 1939, notwithstanding his work had been very satisfactory, Dodge, respondent's assistant superintendent, advised Huff that since he [Huff] was an "awfully good friend of McDaniel's," he had better look around for another job. On the following day, when Huff sought a recommendation, he was called into the office of superintendent Stark and questioned as to how he felt about McDaniel's discharge, and when Huff replied that McDaniel was only doing his duty, Stark said: "Well, from the way you look at things, I am going to let you off a couple of weeks * * * those are Fred Martin's orders." Two days later, a substitute was hired to fill Huff's job. Neither Dodge nor Stark testified.

Respondent contends that Dave S. McIntyre, plant manager, was in charge of the department in which Huff was employed and that it was he who recommended Huff's discharge. McIntyre's derisory version of the discharge is that after Dodge and Stark had informed him that Huff had on several occasions requested a letter of recommendation, he said:

His order is that henceforth and hereafter all set-ups on the die press shall be three-tenths of an hour, his contention is that the standards are loose enough to permit the operators to make up for the lost set-up time.

Some set-ups have a time of two hours down to six-tenths.

This order is a direct violation of his contract and will be treated as such.

But you have my authority to proceed as per the contract.

I am sending attached the record that we have on this, please return at the meeting we will have next Wednesday,

I will try to get a record from Mr. Stork (sic) of today's meeting to make the entire record complete.

Before you go into arbitration see the committee for more complete details.

I expect to have more information from the research bureau covering this subject.

The entire membership say that it is time to do to Martin what England and France are going to do to Hitler, only with more speed.

So until I see you,

I remain

Sincerely and Fraternally

"Give him his discharge, let him go take his job and give him his letter of recommendation."

■ It is obvious that there was ample evidence upon which to base the Board's finding that Huff was discharged because he was a union member and maintained a sympathetic attitude toward McDaniel.

The point is made that the Board was not warranted in finding that the respondent has refused to bargain collectively with the union since October 15, 1939. The argument is that the Board erred in finding that there was a lack of good faith.

The record discloses that early in September, 1939, one Hobert Autterson, an agent of the union, met with superintendent Stark and plant manager McIntyre to discuss the discharges of McDaniel and Huff and the renewal of the November 18, 1938, contract expiring October 15. When he was told that the discharges and contract could be acted on only by Martin, Autterson asked them, and Stark and McIntyre agreed, to arrange a meeting with Martin. On September 6, the union notified Martin that it wished to negotiate a new contract and Martin replied that he expected to be in Aurora the week following September 14 and would arrange a date for a meeting. Martin, however, did not come to Aurora and no date was set. About October 13, Autterson telephoned Martin and informed him that the employees were threatening to strike unless a meeting was arranged. October 14, Autterson, the union committee, and McIntyre met and discussed various provisions of the proposed contract which McIntyre might recommend to Martin, and again Autterson requested, unsuccessfully, that McIntyre arrange a conference with Martin. November 17, Autterson wrote Martin advising that there was some talk of stopping the work unless action was taken immediately and requested that Martin meet with the union not later than November 21. Martin answered that because of prior appointments a meeting on November 21 would be impossible; that the requested wage scale was unsatisfactory and that he could not give his approval to any part of the agreement; that while he did not know when he could be in Aurora, whatever was eventually agreed upon would be retroactive to the expiration date of the old contract. Thereupon Autterson notified Martin that the union had voted to appeal to the International for strike sanction, and that the only thing that could stop a strike would be Martin's appearance in Aurora. During the succeeding week, after Martin agreed to meet the union representatives on December 5, Autterson posted a notice on the plant bulletin recommending that the status quo be maintained. November 30, the union voted to strike.

On December 1, Martin wrote Autterson that he considered the strike to be in violation of the 1938 contract and suggested that the meeting scheduled for December 5 be held at a hotel in Cincinnati. December 5, the union representative arrived in Cincinnati and learned that Martin was not registered at the hotel.

On December 12, Martin met with the union committee, one Addicks, a Federal conciliator, presiding. The conference ended with an agreement satisfactory to Martin and the committee, subject to the approval of the union; the union, however, rejected the terms offered by respondent. December 14, Martin wrote to G. Edward Ten Eyck, a representative of the International, that he was preparing a new contract which he would submit at the next meeting. December 15, Martin wrote Ten Eyck again, saying that "after giving the matter further consideration, we have definitely decided not to sign an agreement and further will not draft one."

On December 28, further changes to be made in the contract were agreed upon, and Martin consented to sign it upon condition that the employees accept it. It was also agreed that the committee and the local plant officials would meet on December 29 to adjust the grievances of the discharged employees. The parties met, discussed these grievances, but reached no agreement. Later that day, the union voted to postpone ratification of the contract until further efforts had been made to secure the reinstatement of Huff. Martin thereupon took the position that the union had broken faith and said that respondent would not sign a binding agreement. January 2, 1940, the union terminated the strike, the employees returned to work, and the union unconditionally accepted the agreement of December 28, but respondent, although requested, refused to sign the contract and Martin stated that he did not consider the respondent bound by any agreement.

The Board's conclusion was that:

"The acts described constitute a refusal to bargain on the part of the respondent.

\* \* \* It is clear that Martin had ample notice, as early as the middle of October, of the importance which the employees quite reasonably attached to the reaching of a binding agreement, and of their dissatisfaction with a representative not authorized to do so. Yet for a month thereafter Martin made no effort to comply with the union's stated request until, on November 18, faced with the necessity for meeting the union's ultimatum as to the wage clauses, he stated that whatever was agreed upon would be retroactive to October 15. The union, however, replied at once that it desired to meet with Martin immediately, thus indicating that it was not satisfied with this arrangement. It was still more than three weeks after this, however, before the union succeeded in meeting with Martin.

"Martin repeatedly referred to the strike as a violation of the 1938 contract which justified subsequent refusals to bargain or sign a contract on his part. The contract provided that the union would not strike during the term of the agreement. The clause set forth earlier, providing for the term of the agreement, can be reasonably interpreted to mean only that upon the giving of notice by the union on September 6 that it desired to negotiate a new contract, the old contract expired on October 15, 1939. Martin's theory to the contrary is most explicitly stated in his letter of December 1, where he stated:

" 'This strike is a direct violation of our contract dated November 18, 1938, effective October 15, 1938, and expiring October 15, 1939, and our letter to you of November 18, 1939, advising you that any changes of the old contract would be retroactive as of the expiring date of the old contract. This was accepted by you with the full knowledge that the old contract was to remain in force until a new contract was entered into.'

"It is clear from the record that the union did not formally 'accept' or informally agree to Martin's offer that any new agreement should be retroactive; and the first intimation to the union that Martin considered the old contract to be still in force came on December 1, after the strike had already started. Moreover, the contract itself provided that 'It is agreed that immediately upon the proper notice for the negotiations of a new agreement, conferences will be scheduled to work out same. \* \* \*' In view of this pro-

vision, and Martin's dilatory tactics, he is in no position to accuse the union of violating the contract.

"We are of the opinion, and find, that Martin's failure within a reasonable time to meet and bargain with the union or to appoint a fully authorized agent to do so, evidences bad faith on his part and constitutes a refusal to bargain collectively within the meaning of the Act. \* \* \*

"There are additional factors showing a violation of the requirements of collective bargaining. After the strike of December 1, 1939, the union representatives remained the collective bargaining representatives of the employees, and the respondent's obligation to bargain collectively continued. The respondent's failure to keep the appointment for negotiations on December 5, 1939, and its vacillating attitude and conduct thereafter, indicates bad faith in negotiating with the union. Moreover, that the union refused to ratify the proposed contract agreeable to the respondent and to union representatives on December 12, 1939, cannot excuse the respondent for taking the position on December 14 and 15 that it would sign no written agreement even though the parties should arrive at terms which the respondent considered fair and equitable and which the union accepted. The respondent was required to reduce to writing the terms of any agreement arrived at between the respondent and the union; and by taking the position that, even should agreement as to terms be reached, the respondent would not sign a written agreement, the respondent refused to bargain collectively. Nor did the failure of the union on December 29, 1939, to ratify the agreement reached the day before, justify the respondent in refusing to enter into and sign an agreement after the union, on January 2, 1940, voted to accept the agreement unconditionally.

"We find \* \* \* that by Martin's failure within a reasonable time either to meet and bargain with the union himself or to appoint a fully authorized agent to do so; by his failure to keep the appointment scheduled for December 5, 1939, in Cincinnati; by his statement on December 14 and 15, 1939, that he would not sign a written agreement; and by his refusal after January 2, 1940, to enter into and sign any agreement with the union, the respondent has failed and refused, since

October 15, 1939, to bargain collectively with the union, thereby interfering with, restraining, and coercing its employees in their exercise of the rights guaranteed in Section 7 of the Act."

We think that what this court said in Singer Mfg. Co. v. National Labor Relations Board, 7 Cir., 119 F.2d 131, 135, substantially like the present case, in which it was contended that the employer had refused to bargain in good faith, is applicable here. There we held that the Board had full authority to determine as a fact whether the employer was acting in good faith or whether its actions amounted to a mere superficial pretense at bargaining,—whether it had actually the intent to bargain, sincerely and earnestly,—whether the negotiations were captious and accompanied by an active purpose and intent to defeat or obstruct real bargaining. See, also, H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 523, 526, 61 S.Ct. 320, 85 L.Ed. 309.

We conclude that the findings of the Board are sustained by the evidence and that the order is valid. The request for its enforcement is granted.