## NATIONAL LABOR RELATIONS BOARD
### v. PENOKEE VENEER CO. et al.
#### No. 9522.

Circuit Court of Appeals, Seventh Circuit.

June 23, 1948.

David P. Findling, Associate Gen. Counsel, Ruth Weyand, Acting Asst. Gen. Counsel, and Bernard Dunau, Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

O. S. Hoebreckx and Clark M. Robertson, both of Milwaukee, Wis., for respondent.

Before SPARKS and KERNER, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

Petitioner seeks enforcement of its order of August 21, 1947, requiring Penokee Veneer Company and Spliced-Wood Corporation to "cease and desist from interfering with the right of their employees to bargain collectively through Local No. 12-381, International Woodworkers of America C.I.O. * * * by attempting to bargain with their employees individually or by any like or related acts."

The conduct complained of, and of which the defendants have been found guilty by the Board is said to violate Section 8(a) (1), of the National Labor Relations Act, 49 Stat. 452, 29 U.S.C.A. § 158.[1]

The narrow question for determination is whether a certain communication sent by respondent companies on April 15, 1946, to their employees can be construed to be an unfair labor practice, which communication is set out in full in Footnote 2.[2]

The respondents are two Wisconsin cor-

---

[1] "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7."

[2] "Penokee Veneer Company—Ballot" "Do you desire to return to work under the wages, hours, and working conditions as proposed by the Company to the Union at the meeting of April 9th?

☐      ☐
Yes      No

April 15, 1946.

"To Our Employees:

"At the request of U. S. Conciliation Commissioner, John Luecke. company representatives met with union represent

atives on Tuesday, April 9, in a further effort to settle the strike.

"At the outset of the meeting Mr. Lambert announced that the union's minimum demands were as previously stated and that in addition, the union was now demanding the right to reopen the question of wages at any time on 30 days' notice. After some further discussion of the union's wage demand, the company submitted a proposal for settling the dispute. A verbatim transcript of the proposal made, together with the union's answer to it, is enclosed. Company representatives again requested that the proposal be submitted to the employees for acceptance or rejection.

porations, located at Mellen, Wisconsin, and engaged in the procurement and processing of logs and the manufacture of various types of veneers. Penokee had about 140 employees, Spliced-Wood 65, and a third company, called the F. A. MacDonald Company (originally a party defendant, but not now involved) 25 employees. In the summer of 1943 the International Wood-workers of America, affiliated with the C.I.O. initiated an organization program among the employees of the 3 companies which culminated in the certification on September 20, 1943, of such union, as the exclusive bargaining representative of the production, maintenance and service employees of the three companies. On April 2, 1945, following numerous meetings, a collective

"Your management has received many indications that a majority of the employees never wanted to go out on strike and further, that a great proportion of employees desire to return to work. Although we have requested on several occasions that you employees be given an opportunity to vote by secret ballot on the question of returning to work on the basis proposed by the companies, the union has consistently refused to conduct such an election. Believing that it is unfair and contrary to American principle for a minority of employees to keep a majority from gainful employment, your management proposes to find out just how many employees want to return to work.

"We are enclosing herewith a card on which the question appears, 'Do you desire to return to work under the wages, hours, and working conditions as proposed by the company to the union at the meeting of April 9th?' The card contains a block for voting 'Yes' or 'No.' Enclosed is also a self-addressed stamped envelope for use in mailing the card back to the company. We have arranged to have Mr. Joseph Webb, local attorney, open the ballots and make a tabulation of the votes received. If employees in sufficient numbers to commence operations indicate they desire to return to work, the company will at a later date announce the reopening of the plant. We will at that time also announce the number of employees who have indicated a desire to return to work.

"The wages, hours, and working conditions which will prevail will be the same as those in effect under the expired union agreement as modified by the proposal made to the union and attached hereto.

"As we have repeatedly stated, no employee is under any compulsion to return to work under the conditions offered. We wish to emphasize that these employees who elect to remain out on strike will be accorded their full rights under State and Federal labor laws.

"We ask that the enclosed card be returned by April 22nd, at which time a tabulation will be made.

"Penokee Veneer Company
"Spliced-Wood Corporation
"F. A. MacDonald Company
"Company's proposition offered to Union at Meeting on April 9, 1946:

"Hoebreckx: I have a proposition to make here that is our final effort to settle this thing. You better take it down, Lambert, because I don't want to be misquoted.

"The company is agreeable to make the five cents increase effective February 8th. Only those employees who return to work within one week after the plant reopens will qualify for retroactivity. It's figured out that retroactivity would amount to approximately ten dollars per employee.

"We will agree to reconsider wage rates any time after August 1st, which proposal was previously withdrawn which we are now agreeable to reinstate.

"Luecke: That is, on August 1st they could open up wages.

"Hoebreckx: That's right, John, just less than three and a half months from this time.

"We are agreeable to reduce the entrance rate period from 60 to 30 days.

"On the daily overtime qualifications, we are agreeable to withdraw any qualification on daily overtime with the understanding that employees who repeatedly are absent without cause will be subject to discharge. That accords with the Union's suggestion for the handling of that situation.

"On Union security, the company stated some time ago that it did not feel the Union had sufficient responsibility and integrity to warrant the companies' assistance in maintaining union membership. We still feel very much the same way. On the other hand, as a convenience to our employees, and for that reason only, we will agree to deduct the monthly dues for all employees who authorize the company in writing to do so, such authorization to be revocable on 30 days' notice by the employee to the company. Incidentally, that is the only kind of check-off legal under state laws. That is our proposition.

"Lambert: Our answer to it right now is, definitely no."

bargaining agreement was entered into between the union and the companies, embracing the usual terms of a collective bargaining agreement and providing for its termination on October 30, 1945. By agreement between the company and the union, this termination date was, in September, 1945, extended for a period of 60 days to December 30, 1945. About a month prior to the expiration of the extension agreement, the union served notice on the company of its desire to negotiate a new agreement, and stated that a proposal would be submitted. The companies agreed to meet upon receipt of the union's proposal and accordingly a meeting was held on December 12th. The company did not accept the proposal of the union, but agreed to submit a counter proposal on certain issues involved. After an exchange of letters a subsequent meeting was held on December 18th, but no agreement was reached. Further negotiations were had on January 3, 1946, between the union and respondents and on failure to reach an agreement, the union held a meeting on January 6th, at which a strike vote was conducted. It appears that less than a majority of the employees voted to strike. However, on or about January 8, the union notified the Secretary of Labor of its intention to strike. The United States Conciliation Service then intervened, and at the instance of the conciliator further meetings were held from time to time between the union and the respondents all without result, and on March 2, 1946, the employees struck, and all production ceased. The conciliation service persisted in its endeavor to bring about an agreement between the parties and various other meetings were had after the strike began. The last meeting was held on April 9th, at which time respondent companies made an additional proposal which the bargaining agent rejected, and refused to submit the proposition to the employees for rejection or approval. The plant having remained closed from the beginning of the strike on March 2, the respondent companies apparently determined to make an effort to open the plant providing they could secure employees in sufficient numbers to operate their business. They did not fix a date for the opening of the plant, presumably because of the uncertainty of whether men could be procured in sufficient numbers to operate the plants.. Consequently, on April 15, 1946, they sent to their former employees the communication which is the subject matter of the finding of unfair labor practice by the Board.

There is no substantial disputed question of fact involved and the decision of whether the conduct of respondents in sending such communication of April 15th amounted to an unfair labor practice turns upon the construction to be placed upon it. The Board concedes that respondents were entirely within their legal rights in undertaking to reopen their plant and were at liberty to employ anybody who wished to work for them for the wages they were willing to pay, and upon the terms and conditions that they were willing to offer. These terms and conditions had been previously submitted to the bargaining agent on April 9th, 1946; and in addressing their inquiry to the former employees, asking them to indicate whether they desired to return to work under the wages, hours and working conditions as proposed by the company on April 9th, respondents were, of course, obliged to disclose to the employees what those terms and working conditions were. This they did in detail in their letter. The board concluded "that the respondents after having bargained to an impasse with the C.I.O. as to wages and other matters, violated Section 8, Paragraph 1 of the Act by attempting to poll each striker as to whether he individually would return to work under the wages, hours and working conditions proposed by respondents, and rejected by his exclusive bargaining representative." They held that by such conduct "respondents sought to by-pass the C.I.O. as the exclusive bargaining representative of the strikers and to deal with each striker on an individual basis."

█ No previous unfair conduct had ever been charged against respondents and the entire record discloses ready and persistent cooperation by the employers with the union in an earnest effort to bring about an agreement. We think the conduct of the employers in sending the letter of April 15th must be measured against this back-

ground of complete recognition of the rights of their employees under the National Labor Relations Act. See N.L.R.B. v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602. A fair interpretation of the letter, we think, discloses that the real object was to ascertain how many, if any, employees desired to return to work on the terms that had been offered. No other or different terms were mentioned to the employees and the letter discloses no effort whatsoever on the part of the companies to bargain with the employees individually. No compulsion was indicated in the letter and the employees were told that those who elected to remain on strike would be accorded their full rights under both the State and Federal Labor laws. The good intentions in this respect of the respondent companies is further disclosed by the following conduct:—On March 25, 1946, in a communication to the employees, respondent said, "In an election held in September, 1943, a majority of the employees of these companies voted for Local 381-IWA-CIO as their bargaining agent. The companies are, therefore, obligated to bargain with the union unless and until a majority of the employees indicate they desire some other arrangement." Again, as late as May 17, 1946, (a month after the sending of the so-called objectionable letter) in response to a representation claim of the American Federation of Labor, a competing union, respondents stated "These companies have been bargaining for the past few years with local 381-IWA-CIO, an organization certified by the National Labor Relations Board * * * the companies are obligated to continue to recognize and bargain with this certified union * * *. In view of this situation, you are informed that the companies will continue to recognize the C.I.O. * * *." Respondents had never been charged with failure to bargain collectively with the recognized and certified bargaining agent of the employees during the entire course of their dealings after the organization of the union. We think, under such circumstances, and with this background, the conclusions drawn by the Board from the communication of April 15th are not justified.

Respondents have urged a number of other reasons why the Board's order should not be enforced. Among them they urge that the Board's order is beyond the scope of the issues that were tried. We find it unnecessary to discuss or rule upon the other reasons assigned for the reason that we believe the board has placed an erroneous interpretation upon the one act that is in controversy here. In the recent case of National Labor Relations Board v. Crompton-Highland Mills, Inc., 5 Cir., 1948, 167 F.2d 662, 663, the Court said, " * * * the only unfair labor practice found by the Board was the granting of a wage increase to its employees without consulting the Union.

"It appears, however, to be undisputed in the evidence of Mr. Douty, the representative of the Union in the State, that when the wage increase was granted, collective bargaining had broken down, the Union had withdrawn from further bargaining in connection with the matter, and a strike vote had already been called. The evidence also seems to be without dispute that the raise in wages was made by the Company to meet competition by other mills in that section. Under these circumstances, it does not appear to be an unfair labor practice to grant a general increase in wages to the employees without consulting the Union." This case goes much farther than respondents' letter of April 15th. While in our case negotiations had ceased between the employers and the union, yet the employers we think were not undertaking to negotiate directly with the men, but were only undertaking to ascertain whether the men wished to return to work, not on any different or more attractive terms, but on the identical terms that had theretofore been tendered by the companies. On oral argument it was conceded by the Board that respondents' purpose was proper, but the method employed in the execution of the purpose, to-wit, the letter of April 15th, involved them in an unfair labor practice. With this conclusion we cannot agree. The petition for enforcement is denied.

KERNER, Circuit Judge (dissenting).

Section 8(a) (1) of the Act provides that "It shall be an unfair labor practice for an

employer * * * to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 * * *." Section 7 of the Act provides that employees shall have the right to bargain collectively through representatives of their own choosing. The question is whether respondents' conduct toward the union amounted to *interference* with respondents' employees in the exercise of their rights guaranteed in § 7 of the Act.

The National Labor Relations Act guarantees to all employees the right to bargain collectively through their chosen representatives, and makes it the duty of the employer to bargain collectively only with the chosen and duly recognized representative of the employees. This obligation, it has been said, is exclusive, and exacts and requires the negative duty to treat with no other. Bargaining by an employer directly with his employees, whether a minority or majority, who have not revoked their designation of a bargaining agent, would be subversive of the collective bargaining which the statute ordained. And under the decisions of the Supreme Court the law is settled that it is a violation of the essential principle of collective bargaining and an infringement of the Act for an employer to disregard the bargaining representatives by negotiating with individual employees prior to a revocation of their authority. Medo Photo Supply Corp v. National Labor Relations Board, 321 U.S. 678, 64 S. Ct. 830, 88 L.Ed. 1007; May Department Stores Co. v. National Labor Relations Board, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145. See also National Labor Relations Board v. Martin Bros. Box Co., 7 Cir., 130 F.2d 202, 204.

The question of what inference should be drawn from the evidence is a function that belongs to the Board. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Southern Bell Telephone & Telegraph Co., 319 U. S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250. And the possibility of drawing either of two inconsistent inferences from the evidence does not prevent the Board from drawing one of them. National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106, 62 S.Ct. 960, 86 L.Ed. 1305. Certain it is, that by the letter of April 15, 1946 respondents calculated to by-pass and undermine the position taken by the chosen and duly recognized representative of the employees, and by thus negotiating with their employees at a time when the question of wages, hours and working conditions was still pending, they ignored the union as the employees' exclusive bargaining representative. In this state of the record I think the Board was justified in finding that respondents had violated § 8(1) of the Act. Consequently, I would enforce the order of the Board.