## NATIONAL LABOR RELATIONS BOARD v. BRADLEY WASHFOUNTAIN CO.

No. 10336.

United States Court of Appeals
Seventh Circuit.

Nov. 1, 1951.

See also, 7 Cir., 188 F.2d 357.

David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel and Fannie M. Boyls, Atty., National Labor Relations Board, George J. Bott, Gen. Counsel, Robert G. Johnson, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

O. S. Hoebreckx, Martin R. Paulsen and Frederick H. Prosser, Milwaukee, Wis., John G. Quale, Milwaukee, Wis., of counsel, for respondent.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

The National Labor Relations Board seeks to have enforced its order entered against respondent. The controversy between the parties had its origin in a complaint issued by the Board in pursuance of charges filed by the International Association of Machinists hereinafter termed the Union. The complaint charged respondent with unfair labor practice in that respondent had refused to bargain with the bargaining agent of its employees by unilaterally granting wage increases on June 30 and October 5, 1948 and by granting certain vacation pay benefits "without consulting or giving notice to the Union" and by refusing to negotiate in regard to Union security on October 21 and thereafter. It further charged that after a strike began on October 19, 1948, respondent refused to negotiate concerning the union shop issue, tried to persuade em-

ployees to abandon the strike and refused, after March 28, 1949, to recognize the Union and to reinstate strikers.

### Events Prior to the Strike.

From 1937 to the fall of 1948 the Union and respondent enjoyed an unbroken collective bargaining relationship under union shop contracts. On January 19, 1948, the Union requested reopening the wage clause in the contract due to terminate the following October, as it was permitted to do thereunder. Negotiations on wages and proposed revisions of the agreement began on June 15 and continued at varying intervals until October 18, when a negotiating meeting broke up in "mutual ill-feeling." The next morning the employees struck and left the plant, remaining out until April 1949, when they sought reinstatement. The employer refused the request upon the ground, except in the cases of two individuals, that their positions were already filled. The other two were strikers who, respondent insisted, engaged in conduct on the picket line which disqualified them as desirable employees.

During the early course of the negotiations the Union requested an increase in wages of 16¢ per hour; the company offered an increase of 10¢. This was not accepted by the Union. However, on June 30, the company notified its employees that, though the Union had not accepted the offer, it believed it only fair that the employees should enjoy a wage increase of 10¢ per hour without further delay. Concerning this offer the Examiner found that the evidence did not sustain the averment of the complaint that the increase was granted without consulting with or notice to the Union. He found further that the Union made its demand; that the employer made an offer which the Union did not accept but that the offer was put into effect after notice to the employees' committee, and that the notice fully apprised the employees that the bargaining agent was unsatisfied with the increase and presumably would continue to ask for the greater amount. Thus, said the Examiner, nothing in the notice reasonably could have been interpreted by the employees as an indica-

tion that the employer was seeking to deprive the Union of prestige; that the latter's action could not be construed as an effort upon its part to persuade employees that they would benefit by withdrawing allegiance from the Union, particularly since for many years "all employees had been required to be union members." In summary, the Trial Examiner found "that in granting the June 30 increase, respondent did not bargain in bad faith and thus did not refuse to bargain." On June 30, the same day when the 10¢ increase was made, the Union notified respondent of its intention to terminate the existing contract, presumably on its expiration date, and of its desire to negotiate a new contract. Respondent acknowledged this letter and confirmed arrangements for a meeting on July 13.

The question of payment for holidays falling within an employee's vacation period was discussed by the negotiating parties in June, the issue being raised as a grievance, apparently, involving interpretation of the contract then in existence. On June 15, the company offered its solution. This was neither accepted nor rejected. On July 12, the employer notified the employees that when the company announced its wage adjustment on June 30, it had neglected to add that "employees who are on vacation during a holiday week will receive their holiday pay." The Union did not protest this disposal of the grievance, and the Examiner found that, inasmuch as it appeared that holiday pay was discussed by the Union and respondent before giving the notice mentioned, in this respect the averments of the complaint had not been sustained.

Negotiation conferences continued through July, August and September at which there was mutual give and take. The Examiner found that there was no evidence that anything occurred during that period which was claimed or could be construed as an unfair labor practice. However, on October 5, respondent notified the employees that, as it had explained to the union committee, it thought it only fair to put into effect a further increase of 5¢ per hour, which had been offered at

the last meeting of the parties, effective September 27. The Examiner found that, on September 26, respondent had offered to the Union a further general increase of 5¢ per hour, that the union committee did not accept the offer but did not protest the action and that the evidence did not support the averment that the October 5 increase was granted without consultation with or notifying the Union. The Union at no time expressed any objection to the company's acts of June 30, July 12 or October 5, except to continue to insist on an increase of 16¢ an hour and on further concessions as to holidays falling during vacation periods.

Though the Examiner had found that the object of the strike was economic in character, to secure a satisfactory new contract, not justified by any unfair act of respondent, the Board found to the contrary that the strike was caused by respondent's conduct in granting the three concessions mentioned and was from its inception an "unfair labor practice strike." The Board seems to have based its finding upon "the absence of an impasse on the critical dates" and it said that "though by September 22 the attitudes had stiffened," the respondent's offer of that date to the Union had cut the existing differences between the parties over wages from 6¢ to only one cent. It reasoned, as indicated by the quotation, that "this concession necessarily enhanced the possibility of a mutually satisfactory settlement" and that therefore "respondent and the Union had not reached a bargaining impasse."

■ We agree that on none of these three dates had a bargaining impasse been reached. The parties were still bargaining; still negotiating concerning the form of a new contract and the requests of the Union not conceded. But we fail to comprehend how the absence of an impasse changed the bargaining from what the Examiner said was good faith to bad faith as found by the Board. The very absence of an impasse to which the Board gives decisive weight in holding that the bargaining was in bad faith, is of contrary impelling force, for it is proof that despite the three concessions to the Union's re-

quest, the parties continued to bargain as contemplated by the Act. We conclude that the Board wrongfully held that what the Examiner held was good faith, and which, we think, the evidence plainly shows was good faith, was in fact bad faith.

Negotiations in the presence of a conciliator were held on October 13 and 18. Concessions were made by each party, but a number of items of disagreement still existed at the close of the last conference. The next morning the employees voted to strike. Parker, representative of the Union, testified that the parties up to that time were trying to reconcile the Union with the thought of the company and that had the Union been able to reconcile the two and had it procured an agreement, there would have been no strike. From this and other evidence the Examiner concluded that the strike was called in an effort to obtain a contract satisfactory to the Union and, therefore, was economic in character as contrasted with action seeking to remedy illegal acts. He found that the concessions made by respondent were not unfair labor practices; that, since they were the only acts claimed by the Board as unfair labor practice before the strike, it followed that "the allegation that the strike was caused by unfair labor practices is not sustained by the evidence." Before the Board the general counsel stated that he concurred "in the findings of fact and in the conclusions of fact and of law contained in the Intermediate Report herein."

### Due Process of Law

Respondent urges that the Board found it guilty of a violation not charged in the complaint; that, inasmuch as the complaint averred in this respect only that the company made certain wage increases without "consulting or giving notice to the Union" and the Trial Examiner and the Board had found that these charges were not true, the Board was not authorized to find that, even though the specific charges were not sustained, the employer was guilty of unfair labor practice in making wage increases before an "impasse" had occurred in negotiation and that, as there was no averment in the complaint that the com-

pany had acted wrongfully in this respect, the respondent had been tried and condemned without due process of law.

First of all we observe that the fact that the charge of the Union in pursuance of which the complaint was issued did not contain specific charges that the wage increases of June 10, and July 12, were in violation of the act was not sufficient legally to estop the Board from issuing a complaint charging that they were improper. Under the present act, as well as its predecessor, the function of the charge is to set in motion the Board's investigatory machinery in order to ascertain whether a complaint shall issue; it is not a pleading; it has served its purpose when the Board embarks upon an inquiry. Kansas Milling Co. v. N. L. R. B., 10 Cir., 185 F.2d 413, 415; N. L. R. B. v. Indiana & Michigan Elec. Co., 318 U.S. 9, 18, 63 S.Ct. 394, 87 L.Ed. 579. The controversy between the Board and the employer begins with the complaint prepared by the Board. N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 122 F.2d 433, 437. Consequently it is without significance that the complaint was broader than the original charge. The latter called upon the Board to make inquiry and, if thought proper, to file a complaint. In pursuance of its administrative duty, the Board, in due course, issued its complaint and thereupon the controversy between the Board and respondent came into existence. Nothing that transpired before the filing of the complaint in anywise limited the right of the Board to include in it the specific charges which it contained.

All this, however, is only preliminary to the real controversy of the respondent in this respect. It insists that, inasmuch as the only averments in the complaint with regard to the increases in wages, that of 10¢ an hour in June and 5¢ an hour in October and the allowance of pay for holidays while on vacation, were that they were made "without consulting or giving notice to the Union," and as they were found not sustained by the evidence, the Board had no right to give further significance to these Acts of respondent. As we have said, both the Examiner

and the Board found as a fact that neither of these averments had been proved. However, the Board proceeded to find that, though the specific assertions in this respect had not been proved, the company, in granting the increases, was guilty of unfair labor practices because, at the time the increases were made, there had not been such a "hardening in the attitude" of the negotiators as is customarily recognized as a bargaining impasse and that the parties "had not adopted positions of such inflexibility as to warrant a belief that further negotiations would be futile." This finding, followed by the Board's condemnation, says the respondent, amounted to a decision against it upon charges not in the complaint of which it had not been advised; as a result, it insists, it has been deprived of due process. Of course anyone charged with violation of the law is entitled to know specifically what complaint he must meet and to have a hearing upon the issue presented, and, were what we have said in this respect the only factual or legal question involved, we would necessarily agree with respondent's position. There is a denial of procedural due process of law when the issues are not clearly defined and the employer is not fully advised of them. Consolidated Edison Company of New York v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126. The Board has recognized the necessity of specific charges in its Statements of Procedure, 12 Fed.Reg. 5651; 13 Fed.Reg. 4871, wherein it is provided that the complaint shall state "the facts relating to the alleged violations of law." In a brief in another cause pending in this court, the Board asserts "We think that these Rules and Statements on their face clearly contemplate that the respondent shall be apprised of what particular unfair labor practice he is charged with committing and that unless the section of the Act describing the unfair labor practice is mentioned, he may be misled and deprived of the opportunity of adequately asserting his legal defenses." Accordingly we are of the opinion that the Board improperly grounded its conclusion as to the increases made in June and October and as to the concession con-

cerning holidays made in July upon a charge not contained in the complaint, as contended by respondent. However, in view of our conclusions on the merits we prefer not to dispose of the proceedings upon procedural grounds, but rather to decide the issues of facts and law upon the record. Thus we avoid the necessity of a remand and consequent delay. We are thus impelled by the further fact that respondent has not been deprived of opportunity to offer evidence. It has made no attempt to offer additional evidence. Nor does it suggest that there is other evidence pertinent to this issue which it might have offered.

### The Conclusion That the Wage Increases and Holiday Concession Constituted Unfair Labor Practice.

As we read the Board's decision it concluded that the wage increases, although awarded by respondent after proposing them to the Union, were improper because at the time of the awards there had not been "a hardening of the attitude of the negotiators." There is no question but that the parties were bargaining from time to time; that the Union had demanded 16¢ an hour increase and certain privileges, and, that, as the negotiations progressed and while they were still continuing, the employer concluded that it would yield to the request of the Union to the extent of at least 10¢ an hour and made allowance of that amount on June 30. The next month it made the allowance as to pay for holidays, and in October an additional 5¢ an hour. All of these awards, as the Examiner and the Board found, were made after notice to and negotiation with the Union, and were in direct response to the Union's request for an increase of 16¢ an hour. The Union was not ignored; it was notified and consulted. Then the employees were notified that, though the Union had not accepted, the company felt it only fair to make the allowances. In other words, the ultimate situation was that the Union had requested 16¢ and pay for holidays and that the respondent, after notice to the Union, had allowed 15¢ and part of the relief prayed as to pay for holidays. How this can be said to have been unilateral is well nigh impossible to see, for it was in fact, compliance with the requests of the Union to the extent made and, as the Examiner found, without prejudice to the rights of parties to continue their negotiations as to the demands not granted and as to the form of a new contract to take effect upon expiration of the then existing one. The allowances were concessions made in response to the requests of the Union. True they did not include allowance of all of the demands, but, as to those which were not allowed, the correspondence and the record as a whole indicate clearly that it was contemplated that the parties would continue to bargain and negotiate as to the balance of the Union requests and as to the form of a new contract. Surely such action constituted no deprivation of or interference with the rights of the employees and no interference with their bargaining agent but was in fact merely concession as to part of the requests made, thus avoiding the necessity of further negotiation with respect thereto.

That such acts upon the part of the respondent are innocent and should be encouraged rather than discouraged is apparent from the reasoning in various decisions having to do with the economic policy underlying the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Thus in N. L. R. B. v. Crompton-Highland Mills, 337 U.S. 217, 224, 69 S.Ct. 960, 963, 93 L.Ed. 1320, the court said: "A unilateral grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining * * * left unaccepted or even rejected in those negotiations * * * might well carry no disparagement of the collective bargaining proceedings. Instead of being regarded as an unfair labor practice, it might be welcomed by the bargaining representative, without prejudice to the rest of the negotiations. See In the Matter of W. W. Cross & Co., 77 N. L. R. B. 1162; In the Matter of Exposition Cotton Mills Co., 76 N. L. R. B. 1289; In the Matter of Southern Prison Co., 46 N. L. R. B. 1268." In N. L. R. B. v. Whittier Mills Co., 5

Cir., 111 F.2d 474, 478 the court commented: "Nothing prevented the employer at any time from changing for the future the wages he would pay. * * * The pendency of a negotiation for a collective contract would not destroy the employer's right in this regard." Likewise, in J. I. Case Co. v. N. L. R. B., 321 U.S. 332, 64 S.Ct. 576, 580, 88 L.Ed. 762, the Supreme Court suggested that "Men may continue work after a collective agreement expires and, despite negotiation in good faith, the negotiation may be deadlocked or delayed; in the interim express or implied individual agreements may be held to govern." The Board itself has reasoned likewise. Thus, in Exposition Cotton Mills Co., 76 N. L. R. B. 1289, the Board said: "We are not convinced that Respondent's action in this instance was a demonstration of bad faith. * * * Respondent had been bargaining with the union for more than two years in good faith, as conceded by the Trial Examiner as well as the union * * * We find that the posting of the wage increase notice on August 2, 1946, when 'appraised in the total context of the case,' did not constitute a demonstration of bad faith on the part of Respondent. Under these circumstances, it would do injustice and not effectuate the policies of the Act to find a violation of Section 8(5) of the Act."

The comment of the Trial Examiner upon this feature of the record is pertinent in its suggestion that the acts complained of in reality had a tendency to enhance the Union's prestige. He said: "The wage increase was less than the employees had instructed their committee to ask for. The notice fully apprised the employees, in effect, that their bargaining agent was unsatisfied with the increase and presumably would continue to ask for the greater amount. Nothing in the notice reasonably could have been interpreted by the employees as an indication that the employer was seeking to deprive the Union of prestige. Since the amount granted was less than the employees, through the Union, had demanded, the action may hardly be construed as an effort on the part of the employer to persuade them that they would

benefit by withdrawing allegiance from the Union, particularly since for many years all employees had been required to be union members." When the company, after notifying the Union, made its allowances, it said in effect: "You have requested certain allowances; we concede the justice of your request to the extent of 15¢ an hour. In the meantime we shall continue to bargain or negotiate with you as to the requests to which we have not acceded and as to the terms of a new contract to succeed the one about to expire." We think this is a far cry from any violation of its duties under the Act but perceive in it rather action favorable to promotion of the purposes of the legislation.

■ It seems obvious to us that it is impossible to construe the facts as disparaging or undermining the Union, especially when taken in consideration with the long historically amicable relationship existing between respondent and the Union. It was not necessary of course that respondent praise the Union for, in the words of Mr. Justice Rutledge in a concurring opinion in May Department Stores v. N. L. R. B., 326 U.S. 376, 66 S.Ct. 203, 216, 90 L.Ed. 145 "Nothing in the Act requires an employer to maintain a union's prestige or to give it credit for originating all proposals which may have some future effect upon his relations with his employees. Section 8(1) forbids interference, coercion and restraint upon employees, in the exercise of their rights, not the mere failure of the employer to magnify the union's influence." It is undisputed that for many years the company had operated, in agreement with the Union, a closed shop; that relations between the Union and respondent had been at all times amicable; that the company at all times had bargained in good faith and that it offered to the Union proposed increases. In all this we find no basis for a conclusion that the company did anything in making the various awards that might in any way be interpreted as violative of the Act. Rather, the undisputed record of respondent's acts disclose that prior to the strike, it constantly and continuously promoted and encouraged the

Union, even to the extent of cooperating with it to procure a mutually agreeable contract for a closed shop prior to the effective date of the amended Act.

### Events subsequent to the strike.

Shortly after the strike commenced respondent sent each of its striking employees a letter indicating that respondent desired to resume operations at its plant and that all employees were welcome to return and would be paid according to the wage scale existing at the time the strike was called. No promises of benefit or threats of reprisal were made. The express purpose was to ascertain, if possible, how many employees wished to return to work should the plant be reopened. However, the letters were relatively ineffective due to the fact that many of the employees returned them, unopened, to Union headquarters pursuant to instructions of the Union Representative, Parker.

Thereafter, respondent's officials personally called on several of the striking employees asking them if they desired to return to work. Then a meeting of employees and respondent's officials was arranged for an evening in November. The employer provided the meeting place. Only eight employees attended. The discussion was limited to an attempt to ascertain how many employees wanted to return to work under preexisting conditions, should the plant be reopened. No decision was reached, and those attending decided to hold another meeting, to which those who had been at this meeting would attempt to bring some of their fellow-workers. Such a meeting was held; some twenty employees attended. Again the discussion was confined to a discussion as to how many employees would return to work, under the conditions existing at the time of the strike, should the plant be reopened. It appeared that a substantial number of employees wanted to return. Respondent then suggested that they proceed to the Union hall and seek a vote on the question as to whether the strike should be abandoned. This the employees did, but the Union representative, Parker, refused to call for the vote.

On December 7, 1948, respondent wrote letters to all of its striking employees indicating its intention to reopen the plant and resume operations. On December 13 the plant was reopened and all strikers who desired to return to work were placed on the payroll. Nineteen employees were in fact reemployed. The shortage of employees was filled by advertising in the local paper, until a working staff of 49 was obtained.

Throughout the strike, until March 28, 1949, respondent met and bargained with the Union whenever the latter so requested. On the last mentioned date, respondent, however, refused to recognize the Union on the ground that it had lost its majority standing. In fact 43 of the employees then working had filed a petition with the Board seeking decertification of the Union. On April 13, 1949 the Union formally called off the strike. All the then striking employees filed unconditional applications for reinstatement, but were told that no jobs were available but that should openings occur, they would be notified.

The Trial Examiner, though he found that the strike was not an unfair labor practices strike at its inception but an economic strike, found further that unfair labor practices on the part of respondent subsequent to its inception turned the strike into an unfair labor practices strike. The Board, reaching a contrary conclusion as to the strike in its origin, did not delve into the subsequent activities of respondent, but in a footnote indicated that it was in accord with the Trial Examiner's findings as to the subsequent conduct of the respondent. Thus, we are faced with the question: Did the so-called back to work movement of respondent amount to a violation of Section 8(a) (1) of the Act? In other words, did respondent "interfere with, restrain, or coerce" its employees in the exercise of their rights guaranteed under Section 7 of the Act?

The cases involving the propriety of an employer's solicitation of individual employees, seem to fall into at least three classes. One involves the situation arising prior to, or during the formation of the union or during a conflict be-

tween two or more unions for the right to represent the employees. The second arises when employees are on strike caused by prior unfair labor practices of the employer. The third is the situation in the present case, namely, where the employees are out on an economic strike. In the first situation it seems clear that the Board and the courts will examine closely the employer's conduct in order to ascertain whether interference or coercion is present. See N. L. R. B. v. La Salle Steel Co., 7 Cir., 178 F.2d 829; N. L. R. B. v. Kropp Forge Co., 7 Cir., 178 F.2d 822; N. L. R. B. v. Winona Textile Mills, 8 Cir., 160 F.2d 201; N. L. R. B. v. Lettie Lee, Inc., 9 Cir., 140 F.2d 243; N. L. R. B. v. Trojan Powder Co., 3 Cir., 135 F.2d 337; N. L. R. B. v. William Davies Co., 7 Cir., 135 F.2d 179. Close scrutiny is necessary, for in such situations any employer activity which tends in the least to interfere with or coerce employees in the exercise of their rights is improper. The second class also represents situations where the Board and courts keep a jealous eye on the employer's activities. See N. L. R. B. v. Montgomery Ward & Co., 9 Cir., 133 F.2d 676; H. M. Ritzwoller Co., v. N. L. R. B., 7 Cir., 114 F.2d 432. This is necessary, for if unfair labor practices of the employer are the cause of the strike, he must not employ improper means to break the strike before the wrong is remedied. In the third case the Board and courts face another problem. Communications with employees by an employer are protected under the First Amendment of the Constitution so long as such communications contain no threat of reprisal or promise of benefit. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; N. L. R. B. v. Penokee Veneer Co. et al., 7 Cir., 168 F.2d 868, 4 A.L.R.2d 1350. The mandate of the statute is that the employer shall not interfere with or coerce the employees in the exercise of their right to organize and bargain collectively. However, absent a showing of interference or coercion, or a threat of reprisal or promise of benefit, in such situations, the employer is free to say to his employees that he wishes to carry on production and, that, if the employees desire so to do, they may return to work.

■■ This classification results in no subtle distinction clouding further the field of labor relations. We conceive it to be realistic based on the recognition of two important considerations. The first is that the employer has the economic right to continue operation of his plant. He may go anywhere for his labor supply, so long as he is guilty of no misconduct in his attempt. The second consideration, and perhaps the more important, lies in the fact that employees, striking for economic reasons, may be replaced and, if, at the conclusion of the strike, positions of employment are not longer available, the employer is under no duty to rehire them. N. L. R. B. v. Columbian E. & S. Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; N. L. R. B. v. MacKay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. However, if a charge of an unfair labor practice on the part of the employer hangs over or threatens him he is compelled to refrain from communicating to his employees his desire to resume operations and to reemploy them, but instead find recourse directly in the open labor market for his replacements. In situations such as the one before us, we think the employer may communicate directly to his striking employees the working conditions he is willing to extend to them; and that, if in the exercise of free choice, the employees return to work, no charge of misconduct may properly be levied against him. If the communications are fair in their description of the situation and they do not offer the returning employees greater benefits than will be extended to those remaining on strike, they do not support a finding of unfair labor practices. N. L. R. B. v. Penokee Veneer Co., 7 Cir., 168 F.2d 868, 4 A.L.R.2d 1350.

■ Turning then to the record in the instant case, viewing it as a whole, it appears that, during an economic strike, the letters sent to the employees and the meetings held with them were designed to accomplish but one thing: to ascertain just how many employees desired to re-

154

turn to work under the then existing pay scale, should respondent reopen its plant. There were no promises of other than normal benefit for those who returned, or threats of reprisal, if they failed to return. The record shows further that respondent requested that the employees attending the final meeting seek a vote of the Union to determine if the strike should be continued. This was rejected by the Union representative. The substantial evidence, viewing the record as a whole, points to only one conclusion, that the communications with the employees were made in good faith, did not interfere with, or coerce the employees in the exercise of their rights to organize and bargain collectively under Section 7 of the Act and were not of such a nature as to support a charge of unfair labor practices under Section 8(a) (1) of the Act. Therefore, the conclusion of the Trial Examiner that the strike, economic in origin, became an unfair labor practice strike because of these later activities, was unsupported by the record. The strike, in its inception, as he found, was economic in nature; it continued as such until its termination on April 13, 1949.

■ Upon cessation of the strike thirty employees applied for reinstatement. They were informed that their positions had been filled but that they would be contacted if help was needed in the future. In view of the character of the strike, it was proper for respondent to fill the vacancies created by the striking employees and it was under no duty to discharge its new employees and reinstate the strikers. N. L. R. B. v. Columbian E. & S. Co., supra; N. L. R. B. v. MacKay Radio & Telegraph Co., supra. In N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 910, 82 L.Ed. 1381, the Supreme Court said: "Nor was it an unfair labor practice to replace the striking employees with others in an effort to carry on the business. Although section 13 of the act, 29 U.S.C.A. § 163, provides, 'Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike,' it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice, nor was it such to reinstate only so many of the strikers as there were vacant places to be filled."

■ The Board found that on October 21 and thereafter, respondent refused to negotiate in regard to union security. Though Section 8(a) (3) of the Act requires that a union shop proposal be approved by a majority of the employees before it can be reduced to a contract, such a proposal is the proper subject of bargaining before the vote is held. Consequently an order directing an employer to bargain on such matters is proper in so far as it "means to do so within the prescribed limits of the law. Where the law requires union security to be approved or authorized by the employees, the order to bargain must be construed as contemplating that action." N. L. R. B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, 134.

■ However, in the present case it does not appear that respondent refused to negotiate in regard to a union shop agreement. (The Trial Examiner construed "union security" to mean "union shop.") True on October 21 respondent indicated its dissatisfaction with the previous union shop agreement; but the testimony relied upon by the Examiner in finding a refusal to negotiate this matter is framed in terms of refusing to agree to such a proposal. Furthermore there is undisputed testimony in the record to the effect that on several occasions after October 21 respondent met with Union representatives and negotiated with them concerning the possibility of continuing the union shop or establishing a modified union shop. Thus, upon consideration of the entire record, we find no substantial evidence to sustain the finding that respondent refused to negotiate in

regard to union security. Hence, the unfair labor practice finding based thereon must also fall.

There remains for adjudication the effect of respondent's refusal to recognize the Union after March 28, 1949. It is conceded that after that date all relations with the Union ceased. The evidence is that, following reopening, a petition signed by 43 employees was filed with the Board seeking decertification of the Union as the exclusive bargaining agent of respondent's employees. At that time there were 49 employees in the working unit. The Board refused to act upon the petition on the ground that an unfair labor practices charge was pending against respondent.

▮▮▮ An employer may not refuse to recognize a Union that has lost its majority status if the cause of the loss was unfair labor practice by the employer, or if the loss occurred during a period when the employer was engaged in unfair labor practices. International Association of Machinists, etc., v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020. However, neither of these rules is applicable here. The Board has held that an employer commits an unfair labor practice when he recognizes a union under circumstances where a question of representation has been raised. Midwest Piping and Supply Co., 63 N. L. R. B. 1060; International Harvester Co., 87 N. L. R. B. 1123. Certainly such a question was raised here. It would appear then, in the normal course of procedure, that it became incumbent on the Union to petition the Board for a determination of the question of representation. This it did not do; yet it is undisputed that a majority of the members had of their own accord, petitioned for decertification. To say that an employer in such a situation, with amicable relations with the Union for 10 years, learning that a majority of the members had voluntarily disclaimed a desire to be connected with it longer, still owed a duty to recognize it is to rob the act of all realities and practicalities. Thus in Pacific Gamble Robinson Co. v. N. L. R. B., 6 Cir., 186 F.2d 106, 109, the court said: "The employer

had recognized and bargained with the union and both the trial examiner and the Board found that up to August 30 no unfair labor practice existed. The union's agent, Alsten, testified that after the strike occurred he made no attempt to contact the employer. The employer is entitled to have its conduct considered in the light of this history, with its complete absence of hostility to the union. National Labor Relations Board v. Penokee Veneer Co., 7 Cir., 168 F.2d 868, 4 A.L.R.2d 1350; National Labor Relations Board v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602; National Labor Relations Board v. Kingston, 6 Cir., 172 F.2d 771, 774."

The petition for enforcement is denied.