**NATIONAL LABOR RELATIONS BOARD v. ALGOMA PLYWOOD & VE-NEER CO.**

No. 7597.

Circuit Court of Appeals, Seventh Circuit.

June 11, 1941.

Rehearing Denied Aug. 5, 1941.

Robert B. Watts, Gen. Counsel, of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and Leslie Clifford, of Washington, D. C., for National Labor Relations Board.

Robert C. Bassett, of Green Bay, Wis., for respondent.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition by the National Labor Relations Board (hereinafter called the "Board") to enforce its order issued August 22, 1940, against respondent pursuant to Section 10(c) of the National Labor Relations Act (hereinafter called the "Act"), 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

Respondent is and was engaged in the production of plywood, veneer, lumber and allied products. Jurisdiction is not in dispute. The complaint issued upon a charge filed by Local 1521, United Brotherhood of Carpenters and Joiners of America, affiliated with the American Federation of Labor (hereinafter called the "Union"). It was alleged that the Union on June 13, 1939, and at all times thereafter, was the duly designated collective bargaining representative of the employees within an appropriate unit of respondent's plant located at Algoma, Wisconsin; that respondent refused to bargain collectively with the Union on June 13, 1939; that on June 15 it conducted in its plant a strike vote which ignored the Union, thereby attempting to avoid its obligation to bargain collectively; that on June 28, it questioned the Union's

majority and refused to cooperate in determining who was the bargaining agent for its employees; that on August 17, 1939, it refused to recognize the Union despite the fact that the Union presented proof of its representative status, and that on June 15, and thereafter, by forming, granting recognition to, and entering into a closed-shop contract with, Algoma Plywood Workers Association (hereinafter called the "Association") as a part of a campaign to destroy the Union's status, sought to evade its obligation to bargain collectively. Such acts, so it was charged, constituted unfair labor practices in violation of Section 8(5) of the Act. By dominating and interfering with the formation and administration of, and in contributing support to the Association, respondent, so it was charged, engaged in unfair labor practices within the meaning of Section 8(2) of the Act. By reason of such unfair labor practices, respondent was also charged with a violation of Section 8(1) of the Act. The Board found against the respondent on all charges and entered the usual cease and desist order and prescribed the affirmative action which the Board found would effectuate the policies of the act.

The contested issues are whether respondent was deprived of due process, whether the findings of the Board are substantially supported, and its conclusions of law in accordance with the act.

Respondent, prior and during the hearing before the Trial Examiner, requested a continuance upon the ground that two of its principal witnesses and officers, namely M. W. Perry, the President, and W. E. Perry, the Vice-President and General Manager, were away from the jurisdiction and could not be produced as witnesses. It was claimed that their presence was necessary, not only because of their testimony on matters relevant to the charge, but that counsel could not properly prepare the case and conduct the hearing in their absence. The witnesses were in Florida and the main reason assigned for their failure to return was that in conformity with their custom, they left Wisconsin because of the rigors of its climate. In other words, they were absent on account of their health. No other reason was assigned as to why they did not return for the hearing. No medical testimony was offered in support of the theory that their health would be impaired by attendance upon the hearing. The Trial Examiner offered to permit the taking of their deposi-

tions or their answering interrogatories, which offer was not accepted. While a study of the record is rather convincing that respondent was handicapped by the absence of these two witnesses, yet we are of the view that the action of the Trial Examiner in denying a continuance did not amount to a deprivation of due process. We think the Trial Examiner, as a court, has a rather wide discretion in a situation such as presented which should not be interfered with by a reviewing court except upon a clear showing of abuse. We are of the opinion that no such showing appears.

The Board, in accordance with the stipulation of the parties, found that respondent's production and maintenance employees, excluding supervisory and office employees, constituted an appropriate unit. The Board further found that on June 13, 1939, and at all times thereafter, the Union was the duly designated bargaining representative of a majority of the employees in that unit. This brings us to the first sharply disputed question in controversy.

■ Before entering into a discussion of the Board's findings and conclusions, we think it is appropriate to make some general observations. We are led to do so from the fact that many authorities are cited by both sides purporting to support their respective contentions upon the numerous questions in controversy. We recognize the binding force of the construction placed upon the act by the Supreme Court, but at the same time we also must recognize that the facts, conditions and circumstances are different in every case, and that what has been held must be considered in connection with the facts and circumstances of the particular case. Thus, any extensive quotation from, and citation of, authorities is of little value.

We have heard much in cases of this character—in fact we have been taught to believe—that respondent's background, the circumstances and conditions surrounding the performance of an act, or the making of a statement, are to be given great weight in the conclusion which may be reasonably drawn from such act or statement. In this connection it is pertinent to point out that in the instant case respondent has a background not unfavorable to the Union and there is an absence of circumstances usually found in such cases upon which the Board, and courts as well, have depended for their ultimate conclusions. For instance, there is no claim and no evidence of industrial espionage, no hostility toward an outside Union, no discharge, demotion, threat or other discrimination against any employee because of Union activity; no statement of any supervisory employee indicating a preference of Union, no statement or act on the part of any supervisory employee[1] indicating directly or indirectly any preference on the part of respondent as between Unions, or as between Union and non-Union employees, and no evidence of financial support to the Association.[2]

■■ The first question is whether the Union had a majority in the appropriate unit on and subsequent to June 13, 1939. The Board found, in conformity with the stipulation, that there were 220 names upon respondent's payroll, and also that 13 of such persons were foremen, leaving 207 employees as comprising the appropriate unit, of which 104 would constitute a majority. The Board introduced in evidence a list in the handwriting of one Qualman, Financial Secretary to the Union, who prepared it from the Union's ledger. It contained 145 names who were admittedly employed by respondent. It was also stipulated that among this number were 9 foremen and a number who were six months or more delinquent in their dues, which, according to the Board, reduced the Union membership to 131, for whom the Union was entitled to bargain. The Board apparently accepted the Union rule that a six months' delinquency in dues automatically resulted in suspension and applied it as to 5 members, but did not apply it as to all in this category. Qualman testified that a member six months delinquent in the payment of his dues was "out of the Union," also, that the date of his suspension was noted on the Union ledger. During his examination he was requested to make a list from such ledger of all members suspended, with the date thereof. This was done and admitted in evidence as respondent's Exhibit 5. It appears therefrom that 25 additional members were suspended prior to

---

[1] There perhaps should be excepted from this statement the activities of Charles B. Cmeyla whom the Board found to be a supervisory employee and whose activities in connection with the formation of the Association will be considered hereinafter.

[2] This statement should be qualified by certain financial support which the Board found, to which we shall later make reference.

June 13, 1939. This would leave a membership of 106. It is not apparent why the Board overlooked these 25 members suspended prior to June 13 as shown by the Union ledger. But even so, the Union had two more than the required majority. The circumstances also aid the Board's conclusion in this respect. Respondent had previously recognized the Union as a bargaining agent and had a contract with it which expired July 9, 1938. Between that time and June 13, 1939, in numerous conferences, it did not question the Union's majority, nor did it so question on June 13, except that respondent's superintendent, during that conference, remarked that respondent "might even question your right to represent the majority." It is now contended that this statement questioned the majority and that the burden was upon the Union to make such proof. We are of the opinion, however, that this contention is not tenable. The statement made, under the circumstances, did not amount to a challenge of the Union's majority and it was therefore under no obligation to so prove. We therefore sustain the finding that the Union had a majority on June 13, 1939. That majority, however, consisted of 106 members rather than 131, as found.

On the other hand, we do not think the Board's conclusion that respondent refused to bargain at the June 13 conference was justified. Considering the occurrences of that occasion alone, it might be sustained, but when considered as we think it must be, in connection with that which had happened before, it is clearly erroneous. The Board states: "* * * Since the expiration of the union contract in July, 1938, the respondent and the Union were engaged, over a period of 11 months, in a series of conferences in an attempt to reach a collective bargaining agreement. * * *"

During that period, as pointed out by the Board, numerous proposals and counter proposals were made. The main stumbling block appears to have been the matter of the closed shop. Respondent proposed one kind of closed shop which the Union was either unable or unwilling to consummate, and the Union proposed another character of closed shop to which respondent would not agree. The Board states in its brief: "* * * When the Union's proposals reached the conference table for collective bargaining on June 13, 1939, it at once became apparent that respondent persisted in the same motives, rendering any genuine collective bargaining impossible. * * *"

The fallacy of this reasoning is that the proposal had been on the conference table for 11 months.

As we understand, the Union proposals at the June 13 conference were substantially the same as those proposed in numerous conferences prior thereto. In fact, one of the Union members testified: "We were instructed to take that agreement back to Mr. Perry," thereby referring to the previous proposal. A member of the bargaining committee testified that the conversation on this date was about the same as that had at previous conferences. In fact, as already stated, and as found by the Board, such bargaining conferences had continued over a period of 11 months. The length of time an employer must continue to bargain in order to demonstrate its good faith, we do not know, but certainly the time is not indefinite. Assuming, as urged by the Board, that a closed shop demand is a proper subject for bargaining, we do not believe that respondent was required to continue the discussion indefinitely. Both sides had endeavored for many months to agree and they were unable to do so. Neither side was required to accept the proposal made by the other. The same thing may be said for other matters in dispute, which had long been considered and discussed by the parties. As stated, the occurrences of this date, when taken into consideration with what had preceded, as must be done, do not justify the conclusion of a refusal to bargain.

The next unfair labor practice charged and found by the Board is that respondent, on June 15, 1939, conducted a "strike vote." In this connection, however, it is pertinent to observe that the Union on the day before passed a strike resolution to the effect that unless respondent "signed an agreement, as submitted to the company by the local, that the local would call a strike." Admittedly this action on the part of the Union was unauthorized. In fact, according to its constitution, it was illegal. The Board minimizes its effect, however, by stating: "It was clearly a resolution designed to enable the Union bargaining committee to take a strong position with respondent in the negotiations." We think it would be more accurate to state that its purpose was to force its demands upon respondent, not by any bargaining process, but by threat of a strike. This action pro-

duced uneasiness among the employees, and on the morning of June 15, 1939, certain foremen circulated petitions among the employees requesting the President to call a meeting of the employees with reference to the situation. Word was passed through the plant that a meeting would be held that afternoon at 4:30. Charles B. Cmeyla, Chief Engineer, was instructed to close the plant. The meeting was held, attended by employees, including foremen. After a speech by Superintendent Perry, Cmeyla was elected Chairman, and a vote was taken as to whether the employees were favorable or unfavorable to a strike. The vote was by secret ballot, participated in by 211 employees, of which 147 voted against a strike. There is no complaint but that the vote was fairly taken, but it is claimed and has been found that such action was an unfair labor practice in that it was the beginning of "a systematic campaign of unfair labor practices directed at the Union" and was "a part of respondent's plan to discredit the Union in the eyes of its own members and other employees at a time when it was attempting to negotiate a new agreement," and that it thereby sought "to avoid its obligation to bargain with the Union." The Board's conclusion necessarily revolves largely around the speech made by Mr. Perry before the vote was taken. This speech must be interpretated as a whole and not from certain phrases isolated from its context, as the Board has done. We regret the necessity for reproducing this speech in its entirety, but there appears no other way of demonstrating the erroneous interpretation placed upon it by the Board. We therefore copy the speech in a footnote.[3]

There is no occasion for us to elaborate on this point. The speech speaks for itself and, in our judgment, completely refutes the Board's conclusion that it constituted a threat as to how the employees should vote, or that it deprived them of the right to freely express themselves on the question presented. There is no substance in the argument that respondent thus notified the employees that it would immediately close the plant unless they repudiated the Un-

---

[3] "For the benefit of those who may not be familiar with the reason for calling this meeting, I would like to explain to you that this afternoon I received a petition signed by a considerable number of employees asking the privilege of conducting a secret ballot as to whether or not a strike should be called in this factory. I am glad to have that question brought up because ever since Tuesday night, I have heard rumors that a strike would be called, but as yet, I have had no official notification from the union committee that that decision had been reached or when the strike would become effective.

"Now, I am not permitted by law to tell you to go ahead and strike, and am not permitted by law to ask you not to strike. That is something you men under the law have the sole right to decide. I only want to say that if you are going to strike, it would be better for the company if you went ahead and struck. If you are not going to strike, the company should know it, because we have not been able to put any orders in this factory for the last three days, and we have reached the point now where there is nothing to work on. There are plenty of orders on file in the office which have not been issued because of the uncertainty of our being able to operate. You will understand why we can not accept a man's order and tell him there is a possibility that after we put his order into production our men are likely to walk out and his order will set here. Now, when I mention having orders in the factory, or in the office rather, they are just the miscellaneous run of jobs calling for a dozen, or two or three dozen panels. We have had three or four larger jobs which we have absolutely had to decline and tell these people we can't possibly handle their order at this time because we don't know where we are at.

"I think it is an awfully good thing for you men to take a ballot and decide what you are going to do and let us know what you are going to do. If you are going to strike, that is your business; it is your privilege to strike if you want to strike; and if you do not want to strike, there isn't anything in the law that will compel you to do so. If you are not going to, make up your mind, so we can put some business out in the factory. I tell you by Monday morning we are not going to have work enough in this plant to keep even a skeleton crew busy unless some of these orders are released.

"Now, this is as far as we can go. I want to turn this meeting over to you men. I want you to remember in fairness to every man employed here, he has a right to freely express his opinion on this question. I want every man who is in favor of a strike to vote in favor of a strike, and if you are not in favor of a strike, do not be afraid to vote that way. We want an expression of the sentiment in the plant; so vote one way or the other. That is all."

ion's stand. Certainly every sensible employee, of his own knowledge, was aware of the fact that the inevitable result of a strike would be the shut-down of the plant followed by the inability of respondent to manufacture and fill orders for its product.

The Board found: "It is clear that the meeting was initiated and sponsored by representatives of the management." The Board overlooks the fact that at least two of those who circulated petitions requesting the meeting were members of the Union. Assuming, however, that this finding was justified, what was respondent to do when confronted with such a situation? On the day before the Union, by an illegal strike vote, had threatened to close the plant unless its demands were met. Was respondent required to sit idly by and accept orders which it could not fill if the Union's threat was carried out, or was it justified in fairly ascertaining what it could expect of its employees? In our judgment the latter alternative was a proper and necessary business expedient. It must be kept in mind that it is the employer who is required to meet the payroll, and we do not think it is the purpose of the act to deprive him of all discretion as to how his business is to be conducted. Under some circumstances, the instigation of a strike vote by an employer might constitute an unfair labor practice, but not under the situation here presented. Fine spun theories must give way to common sense.

▮▮ The Board's conclusion that respondent was guilty of unfair labor practices in its refusal to bargain with the Union on numerous dates subsequent to June 13, 1939, is dependent largely upon the Board's conclusion that respondent was guilty of an unfair labor practice in the formation, recognition and administration of the Association. This is so for the reason that respondent's refusal to bargain with the Union on June 28, 1939, and thereafter, was based upon its challenge that the Union did not represent a majority of the employees in the appropriate unit. That there was a shift of employees from the Union to the Association is not in dispute. It is the theory of the Board, however, that this shift was occasioned by the unfair

labor practice of respondent in connection with the Association and that it can not, therefore, take advantage of a situation occasioned by its own illegal act.

We shall, therefore, next consider respondent's connection with the organization and administration of the Association. The Board states "that impetus for the organization of the Association was furnished by respondent rather that by its employees." In the following sentence, it is stated "that the Union strike vote held on June 14 'was the subject * * * that lit off the whole thing.'" We think the latter statement properly describes the situation. It was the illegal strike vote of the Union which dissatisfied the employees and was the immediate occasion, not only for the strike vote conducted by respondent, but for the organization of the Association which rapidly followed. There is evidence that prior to June 15, there had been talk of an Independent organization, but no action taken. After the strike vote meeting of June 15 had adjourned, a number of employees remained. Included among these was Charles B. Cmeyla[4] who asked "those who were interested in joining the Independent Union to sign up." Some 47 employees signed a paper expressing a desire to join. The next morning a notice on the bulletin board signed by Cmeyla stated that a meeting would be held for the purpose of organizing a local Independent Union. Along with this notice appeared one signed by Vice-President Perry thanking the employees for participating in the strike vote and stating that he had authorized the release of numerous orders, and that operations at the plant would continue for an indefinite period.

On June 16 a meeting was held, presided over by Cmeyla as temporary chairman, attended at the request of Cmeyla, by one Murphy, an attorney, who had had experience in the formation of Independent Unions. Murphy took charge and Cmeyla left the meeting. It is pointed out by the Board that Cmeyla's son-in-law and son were elected temporary chairman and secretary, respectively, although there is no claim that they were supervisory employees. Subsequent meetings were had, a constitution and

---

4 The Board found Cmeyla to be a supervisory employee. Respondent denies that he had any supervisory capacity. While we are unable to determine from the record the extent of supervisory duties performed by him, yet he was referred to by one witness as a supervisor, and he was so designated in a stipulation entered into at the hearing. He must thus be considered as a supervisory employee.

by-laws adopted, an executive committee named and permanent officials elected. With the exception of the activities of Cmeyla, no other supervisor or person connected with the management is shown to have had any connection with the formation or activities of the Association. There is not a scintilla of evidence that any statement was made, or any act committed by any person connected with the management, either favorable to the Association or unfavorable to the Union. Murphy, as attorney for the Association, was paid a substantial fee by the Association from dues collected from its members. Therefore, the only circumstances for the Board's conclusion is Cmeyla's connection with the matter. On the day following the initial movement in the formation of the Association, there appeared upon respondent's bulletin board a notice signed by Perry as Vice-President, as follows: "Reports have reached me that efforts are being made to organize an Independent Union. Let it be definitely understood that under no circumstances will the solicitation of memberships be permitted during working hours; nor will we permit anyone to discuss union activities except when the factory is not in operation. Disregard of this order will constitute sufficient cause for discharge."

There is no evidence but that strict adherence was accorded the admonition contained in this notice. It seems to us that any impression made upon the employees by the activities of Cmeyla would have been removed by this notice. But this is not all. We now refer to a fact, ignored by the Board, in evaluating the attitude and conduct of respondent as between the Association and the Union. As found by the Board in accordance with the stipulation of the parties, 13 of respondent's employees were classified as foremen. Of these, in accordance with the Board's decision, Cmeyla alone had anything to do with the affairs of the Association. On the other hand, the record discloses that 9 persons classified as foremen were members of the Union.[5] The fact that 9 foremen participated in the affairs of the Union, and one in those of the Association, completely refutes any suggestion that the latter was acting in behalf of respondent, and any

thought that the employees could have been impressed with respondent's interest in the Association. Furthermore, if the activities and affiliations of respondent's foremen produced any effect on the employees, which we doubt, it must have been that respondent was favorable to the Union rather than the Association. The fact that a majority of respondent's foremen were members (one the Recording Secretary) of the Union, also refutes the Board's theory of hostility toward the Union and that respondent commenced "a systematic campaign of unfair labor practices directed at the Union." The Board's conclusion, therefore, that respondent was guilty of an unfair labor practice in the formation of the Association, is without substantial support. The record is persuasive and we think conclusive to the contrary.

Early in August, 1939, the Association requested a conference with respondent to discuss recognition. A conference was had on August 7 at which was produced 116 signed application cards. Respondent checked these with its payroll, accepted them as sufficient proof of a majority to warrant recognition and gave the Association a written statement acknowledging it as sole bargaining agent. On August 21 a notice was posted in the plant, signed by Perry, officially recognizing the Association as the exclusive representative of the employees. On September 8 an agreement was made between respondent and the Association which required membership in the Association as a condition for all old employees hired after January 1, 1939, and for all new employees. This "partial closed-shop" provision is another circumstance relied upon by the Board to show discrimination in favor of the Association. We think this circumstance is without significance, especially in view of the fact that respondent, in its bargaining with the Union, offered a closed-shop provision which the Union was unable or unwilling to accept. The Board also argues that the contract itself is evidence that the Association was dominated by respondent. It is pointed out in particular that many requests made by the Association were not granted and that the contract makes no provision fixing wages, hours or seniority.

[5] Edward Detzen, William Hackett, John Laurent, Frank Mraz, Frank Marr, John Poape, Rudolph Serrahn, George Thomas and Harold Mraz. The last named was Recording Secretary of the Union. All of these foremen were members until subsequent to October 9, 1939, except Frank Marr and Rudolph Serrahn who were suspended July 8, 1939. Harold Mraz, the Recording Secretary of the Union, was a member at the time of the hearing.

The contract, however, did not purport to be final—in fact, it expressly provided that it would bargain with the Association with reference to such matters. We are not concerned with whether respondent bargained with the Association in good faith, except as it may throw light upon the charge of respondent's domination of the Independent and for this purpose its conduct carries little, if any, weight.

■ The financial support relied upon by the Board is almost too trivial to mention—that is, "by furnishing the refreshments at the Association social gathering on November 4, 1939." The facts are that at the request of a committee of the Association, a meeting was had with Perry, and in the course of a conference concerning other matters, it was hinted that they would like to have some refreshments for a picnic. The refreshments were furnished and paid for by Perry upon the condition that every employee in the plant be invited, and this was done. The record does not disclose the quantity, quality, character or costs of the refreshments supplied. It requires more imagination than we possess to believe that proof of this circumstance has any bearing on domination of the Association.

We now return to events which occurred subsequent to the "strike vote" of June 15, 1939, discussed heretofore. On June 17, 1939, the Union filed charges with the Board alleging that respondent had engaged in certain unfair labor practices. On June 28, a conference was had participated in by Perry, Bassett (attorney for respondent), a representative of the Union and a field examiner of the Board. Respondent again took the position that it was willing to bargain with any group which had a majority of its employees, but expressly challenged the Union's claim to majority. The Union offered to make proof of such majority by a comparison of its ledger with respondent's payroll. Respondent insisted upon a "current check" and suggested either an election or the submission of petitions, or authorization cards signed within two months. The Board found "each of these methods, seemingly fair and objective on its face, when viewed in the light of the respondent's activities on and after June 15, referred to above, and the respondent's domination of and interference with the formation and administration of the Association, as found below, takes on a different color." Inasmuch as the Board's conclusion with reference to the events of June 15 and subsequently, as well as its conclusion with reference to respondent's domination of the Association are improper, as pointed out heretofore, it follows that its conclusion with reference to the June 28 conference is also improper.

The record discloses to a certainty that the question of the Union's majority was in doubt. As we have shown, it had a majority of only two on the preceding June 13, and also as the Board itself found, there were many names on the Union's ledger who were not members in good standing. Under the circumstances, it is apparent that the ledger would not have furnished proof as to its eligible members on June 28. We do not understand the Board to so contend, but it proceeds upon the theory that respondent illegally fostered and formed the Association and that any shifting of members from the Union to the Association could not properly be taken into consideration. Authorities are cited in support of this theory, but in view of our conclusion that the Association was not sponsored or dominated by the respondent, the theory and authorities are without application.

■ On June 30 the Union filed a petition with the Regional Office of the Board seeking certification as the collective bargaining agency. Without making certification as requested, the Board on September 21, 1939, at the behest of the Union, permitted the withdrawal of its petition. Between July 17 and August 2, 1939, petitions were circulated by the Union signed by 111 of respondent's employees in which it was requested that the Union "retain the bargaining rights." As stated heretofore, the Association on August 7 presented respondent with membership cards indicating that 116 employees had joined that organization. Thus respondent was faced with the dilemma of determining which organization had a majority—one claiming 111 members and the other 116. A check of the proof submitted, however, disclosed that 31 employees had signed up with both. Another conference was held on August 17, 1939, attended by the parties who attended the conference of June 28, 1939, and also by Murphy, attorney for the Association. Respondent took the position and we think properly, that the 31 members, termed "fence riders," could not be counted for either organization in determining a majority. The attorney for respondent took it upon himself, by personal

investigation, to determine which organization these "fence riders" desired as their representative, and decided that a sufficient number desired the Association to give it a majority, and, as stated heretofore, on this basis the Association was recognized. Whether this was a proper method of determining the Association's majority, we are not called upon to decide. We are only considering whether the Union, when challenged, offered proper proof of its majority.

The question of which organization had a majority continued to be a matter of dispute, and at the suggestion of respondent's attorney, an election was held on company property for making such determination. The plant was closed down and the election attended by all employees qualified to vote. As found by the Board, "Perry addressed the employees, stating that the respondent was in doubt as to what organization represented the majority of respondent's employees and that he wanted to know who was qualified to represent them for the purpose of drawing up an agreement." The Board's form of ballot was used and the President of the Union and the President of the Association acted as clerks of election, although they had no express authority from their respective organizations so to do. The ballot was secret and the employees were permitted to vote for either labor organization, or neither. One hundred sixty-seven ballots were cast, of which the Association received 110, the Union 45, 6 were in favor of neither and 6 were void. Thirty-four eligible employees did not vote. Apparently the Board makes no attack upon the fairness of this election other than that it was participated in by the Association. So far as we can ascertain, the only purpose respondent had in calling this election was to resolve the dispute as to which organization had a majority. The result of the election confirmed the previous determination of respondent that a majority was affiliated with the Association.

An employer, when demand is made by a labor organization for recognition as a bargaining representative, must decide at its own hazard whether it represents a majority. In our view, respondent endeavored in good faith to make such determination. On June 13, 1939, the first date on which respondent was charged with refusing to bargain, the Union had a bare majority of two. Shortly thereafter its majority status was challenged and at no time did it meet the challenge by satisfactory proof. It is plain that most of the employees who had not been affiliated with the Union joined the Association, and that some who had been members of the Union shifted to the Association. It is certain that thereafter the employees were almost evenly divided between the Union and the Association. We have no hesitancy in saying that, in our judgment, neither the Board nor this court could determine with any degree of certainty as to which had a majority. The proof is slightly favorable to the Association but not sufficiently so to be decisive. That respondent was in a predicament as to which union it should recognize is apparent. At its insistence, the Union petitioned the Board for certification of the agent which it should recognize. This request on the part of the Union was pending from June 30 to September 21, 1939, when the Board permitted its withdrawal. Thus, the Board for almost three months, notwithstanding the insistence of respondent and the petition of the Union, failed to call an election. Instead, it relies upon evidence that the Union had a majority, the nature of which is so uncertain and speculative that it can not be held to be substantial.

We reach the conclusion that the Board's order is invalid and its petition for enforcement is denied.

KERNER, Circuit Judge (dissenting).

It is not our province to appraise conflicting and circumstantial evidence and the weight and credibility of testimony, nor to choose one inference or conclusion in preference to another.

With these principles in mind, on the vital or principal questions of fact, that there was a refusal to bargain collectively and other violations of the act with regard to the association, I have been unable, on the record in this case, to say that there was no substantial basis in the evidence to support the findings of the Board; consequently, the order of the Board should be enforced.