**NATIONAL LABOR RELATIONS BOARD
v. KINGSTON.**

**No. 10769.**

United States Court of Appeals
Sixth Circuit.

Feb. 21, 1949.

Louis Libbin, of Washington, D. C. (David P. Findling, Ruth Weyand, and Thomas F. Maher, all of Washington, D. C., on the brief), for petitioner.

Stanley E. Eastman, of Marinette, Wis., for respondent.

Before HICKS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The National Labor Relations Board, petitioner herein, in accordance with the provisions of the National Labor Relations Act, as amended by the Labor Management Relations Act of 1947,* after proceedings on a charge against respondent, Kingston, that he was engaged in unfair labor practices, found that he was engaged in such practices within the meaning of Section 8(a) (1) and Section 7 of the Act.

Section 8(a) of the Act provides:

"Sec. 8. (a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 * * *."

Section 7 of the Act provides: "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively tively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities * * *."

The Board, accordingly, entered an order requiring respondent to cease and desist from interfering with, restraining, or coercing his employees in the exercise of their rights guaranteed by the Act, in holding elections among his employees for the purpose of ascertaining their desires with respect to union representation or any like or related acts; and to post appropriate notices at his place of business advising his employees that he would not interfere with them in the manner above mentioned. The present petition is filed by the Board, asking this court to decree enforcement of the foregoing order.

The facts upon which the order was based are as follows: Russell Kingston, the respondent, operates a saw mill in Stambaugh, Michigan, where he is engaged in the production and manufacture of lumber and wood products. It is agreed that he is engaged in interstate commerce. During the period relevant to these proceedings, the International Woodworkers of America, a union labor organization, conferred

---

* 29 U.S.C.A. § 141 et seq.

with respondent, Kingston, and claimed to represent a majority of the employees in his business. Kingston, however, questioned that the union actually represented a majority of his employees, and after some discussion, both Kingston and the union agreed to be bound by the results of an immediate election to be held under their joint auspices. Certain diffculties arose as to the eligibility of various employees to participate in the election because they were temporary employees, and also because of the fact that a number of regular employees were absent "haying" or engaged in work on their farms. Letters were thereafter exchanged between Kingston and the union, and Kingston's final word was that he would be glad to negotiate with the union at any time it could prove that it represented a majority of his employees. No further response was made by the union; no further meetings took place; and no election was ever held.

Some time after the conclusion of the conferences with the union, respondent, Kingston, informed his superintendent that he wanted the employees sent to the millwright's office as he wished to talk to them. When the employees had assembled, Kingston informed them that he was about to make bids for timber that was up for sale in the "national forest," which was the source of all of the lumber produced by respondent; and that he wanted to know before actually fixing and submitting bids for the timber, whether the employees wanted a union in the mill. Kingston testified, on the hearing, that he was merely trying to find out what the employees wished to do about a union, and if they desired to have one, he wanted to have a contract with it before he bid on the timber, in order to know what his labor costs were going to be in the mill. He requested that the men indicate whether or not they wanted a union in the mill, and informed them that he had ballots prepared, reading as follows:

Kingston Mill

Union Organization

For        Against

Kingston then asked the employees to come to the office, take the ballots and mark them in pencil in secret so that no one could see them, fold them, and put them in a cigar box. He emphasized that he did not want them to sign their names to the ballots and did not want to know which way any man voted. He also mentioned to them that the ballot "was strictly unofficial" and only for his own information. The men voted the ballots in accordance with his request. After they left the office, the ballots were counted by respondent and his bookkeeper, and disclosed eighteen votes "Against" and six votes "For." Kingston testified that, as a result, he "naturally took it from that that the men generally were satisfied with the wages and bonus arrangement we were working under and I could continue to operate as I had in the past * * * and bid in another piece of timber for our operations."

The Trial Examiner, in the hearing below, found that the proof showed that the woodworkers' union had been selected by the employees as their bargaining agent; that Kingston was guilty of bad faith in questioning the right of the union's representation of the majority of the employees; and that he had unlawfully refused to bargain collectively with such union as their representative. The Trial Examiner further found that although respondent knew that the union represented a majority of the employees, he undertook to destroy such majority by holding an election under circumstances and conditions which threatened the employees with loss of their employment if they did not abandon their union affiliation; and that, thereby, respondent interfered with, restrained, and coerced his employees in the exercise of their rights of self-organization for collective bargaining.

On review, however, the Board disagreed with practically all of the Trial Examiner's findings. It found that respondent acted in good faith in questioning the fact of union representation, and in refusing to bargain until it furnished evidence of its majority status. It further found that the union had never offered any cogent evidence of such status; that it was not the representative of the majority of the employees; and that the respondent had honestly cooperated with the union in every way to secure mutually satisfactory evidence of the employees' desire for collective bargaining. In all of the foregoing, the Board found

that respondent's conduct was entirely blameless. In its decision and order, the Board said:

"* * * we find no reason to believe that the respondent acted other than in good faith in questioning the Union's majority representation and in refusing to bargain until the Union furnished evidence of its majority status. At no time during the period it was seeking recognition did the Union offer any cogent evidence to support its claim.

"Notwithstanding, the respondent endeavored to cooperate with the Union to secure mutually satisfactory evidence of the employees' desire for collective bargaining through the Union, by agreeing to the Union's proposal for an immediate informal election. That no election was ever conducted, in accordance with the proposal, may be attributed only to an honest disagreement of the parties as to certain eligibility questions.

"We are unable to agree with the Trial Examiner that the respondent's subsequent conduct evinced a lack of good faith in refusing to bargain with the Union. While the respondent's poll of its employees on August 26, 1946, as to their desire for representation by the Union was violative of Section 8 (1) of the Act—and we so find, as did the Trial Examiner—it fails to establish that prior thereto the respondent did not have an honest doubt as to the Union's majority status.

"Nor do we agree with the Trial Examiner that the respondent's explanation to his employees of the purpose of the poll may be reasonably construed, in the circumstances here present, as an implied threat of 'loss of their employment if they did not abandon the Union.' The respondent merely stated, in effect, that before actually fixing and submitting bids for certain lumber it wanted to know whether the employees 'wanted a Union in the Mill.' We perceive no threat of economic reprisal in this statement, especially when viewed in the light of the respondent's contemporaneous statement that the employees should 'vote just exactly the way they thought.'"

In the face of the foregoing findings and order, the Board, with seeming inconsistence, sustained the Trial Examiner's finding that the respondent's poll of his employees which was taken to ascertain whether they were for or against union organization was an unfair labor practice and in violation of Section 8(a) (1) of the Act, governing the right of the employees to self-organization and collective bargaining.

The precise question here in controversy has not up to now been before the courts for adjudication. However, in National Labor Relations Board v. Penokee Veneer Co., 7 Cir., 168 F.2d 868, 870, the court denied the Board's petition for enforcement of an order requiring the company to cease and desist from interfering with the right of its employees to bargain collectively through the woodworkers' union, through attempting to bargain with the employees individually. In that case, after more than six months spent in negotiations between the company and the union with respect to the terms of a new agreement, a strike was called by the union. A strike vote had been taken some time before the action of calling the strike, and, at that time, less than a majority of the employees voted to strike. After the employees were on strike, the company made a proposal, which the bargaining agent rejected, and refused to submit the proposal to the employees for rejection or approval. The company then determined to make an effort to open the plant, providing it could secure employees in sufficient numbers to operate its business, and sent letters to its employees on strike asking them whether they desired to return to work under the wages, hours, and working conditions as proposed by the company to the union at the last meeting. The conditions which had been proposed by the company were specified in the letter, and a slip was enclosed in ballot form on the question of returning to work with blanks for marks of "Yes" and "No." A majority of the employees answered the letter and expressed their desire to return to work under the named conditions and the business of the company was thereafter resumed. In holding that the sending out of the letter and these ballots to ascertain whether the employees desired to return to work was not an unfair labor practice in violation of Section 8(a) (1) of the Act, the court said:

"There is no substantial disputed question of fact involved and the decision of whether the conduct of respondents in sending such communication * * * amounted to an unfair labor practice turns upon the construction to be placed upon it. * * *

"No previous unfair conduct had ever been charged against respondents and the entire record discloses ready and persistent cooperation by the employers with the union in an earnest effort to bring about an agreement. We think the conduct of the employers in sending the letter of April 15th must be measured against this background of complete recognition of the rights of their employees under the National Labor Relations Act. * * * Respondents had never been charged with failure to bargain collectively with the recognized and certified bargaining agent of the employees during the entire course of their dealings after the organization of the union. We think, under such circumstances, and with this background, the conclusions drawn by the Board from the communication of April 15th are not justified."

A somewhat similar situation was disclosed in National Labor Relations Board v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602, 605, where a union bargaining agent, after eleven months of negotiating with the company, passed a strike resolution to the effect that unless the company signed an agreement, as submitted by the union, that the latter would call a strike. The company then called a meeting of its employees and a vote was taken by secret ballot as to whether or not the employees favored a strike. Out of 211 employees voting, 147 voted against the strike. The Board held that the strike vote was an unfair labor practice under Section 8(a) (1) of the Act. On proceedings for enforcement, the court, in denying the Board's petition, observed: "We have heard much in cases of this character—in fact we have been taught to believe—that respondent's background, the circumstances and conditions surrounding the performance of an act, or the making of a statement, are to be given great weight in the conclusion which may be reasonably drawn from such act or statement. In this connection it is pertinent to point out that in the instant case respondent has a background not unfavorable to the Union and there is an absence of circumstances usually found in such cases upon which the Board, and courts as well, have depended for their ultimate conclusions. For instance, there is no claim and no evidence of industrial espionage, no hostility toward an outside Union, no discharge, demotion, threat or other discrimination against any employee because of Union activity; no statement of any supervisory employee indicating a preference of Union, no statement or act on the part of any supervisory employee indicating directly or indirectly any preference on the part of respondent as between Unions, or as between Union and non-Union employees, and no evidence of financial support to the Association."

After reviewing the facts and discussing the arguments of counsel, the court concluded: "Was respondent required to sit idly by and accept orders which it could not fill if the Union's threat was carried out, or was it justified in fairly ascertaining what it could expect of its employees? In our judgment the latter alternative was a proper and necessary business expedient. * * * Under some circumstances, the instigation of a strike vote by an employer might constitute an unfair labor practice, but not under the situation here presented. Fine spun theories must give way to common sense."

In the present case, respondent had a background not unfavorable to unions and union organization. There was no hostility against employees because of union activity, and no interference by the respondent in the organization of the employees. He had expressed no opinion on the merits or demerits of unions, and attempted in no way to disparage or discourage such organization. There never was a bargaining agent that represented the majority of respondent's employees. The Board itself found that the respondent's explanation to his employees of the purpose of the poll could not have been reasonably construed as an implied threat of loss of their employment if they did not abandon the union; and it further found that there was no threat of economic reprisal in respondent's statement that before actually fixing and submitting bids for certain timber, he wanted to know

whether they wanted a union in the mill. In all of his conduct and relations with the union representatives and his own employees, the respondent was found by the Board to have acted in good faith. The Board's conclusion that respondent was guilty of an unfair labor practice in his poll of employees is without substantial support in the evidence.

The petition for enforcement of the Board's order is, accordingly, denied.