**PACIFIC GAMBLE ROBINSON CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 11124.

United States Court of Appeals Sixth Circuit.

Dec. 19, 1950.

Perry R. Moore and Robert W. Dygert, Minneapolis, Minn. (Perry R. Moore and Robert W. Dygert, Minneapolis, Minn., on the brief; Stinchfield, Mackall, Crounse & Moore, Minneapolis, Minn., Sullivan, Veum & Morhead, Sault Ste. Marie, Mich., of counsel), for petitioner.

Clarence Meter, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Fannie M. Boyls, and Louis Schwartz, all of Washington, D.C., on the brief), for respondent.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

This case arises out of a petition to review and set aside an order of the National Labor Relations Board finding the petitioner (hereafter called the employer) guilty of unfair labor practices. The Board has filed an answer in opposition to the petition to review, asking for enforcement of its order.

On November 3, 1948, a charge was filed setting up an alleged refusal of the employer to bargain on or about May 12, 1948, and subsequently. On March 29, 1949, an amended charge was filed, alleging a refusal on the part of the employer to reinstate certain employees, and that on or about August 30, 1948, and at various times thereafter the employer, during the course of a strike, urged and induced its employees to abandon the union and return to work; made unilateral offers of wage increases to its employees for the purpose of inducing them to return to work; and unilaterally made effective wage increases without negotiation of such increases with, or notice to the union.

The Board found that the employer refused to bargain collectively after August 30, 1948, in violation of § 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1, 5).

The following facts are undisputed: The employer, a corporation located in Seattle, Washington, operates a number of plants at various places within the United States for the wholesale distribution of fruit, vegetables, groceries, and

other produce. The plant involved in this proceeding is located at Sault Ste. Marie, Michigan. The work was somewhat seasonal, many more employees being engaged for the summer than at other times of the year.

In 1947 the union representing a majority of the employees executed a contract with the employer, which expired May 31, 1948. The contract provided for 77 cents an hour for the first six months of employment, 82½ cents an hour for the next six months, and 88 cents an hour thereafter. It also contained provisions as to seniority, apprenticeship, the right of the employer to discharge without warning notice for dishonesty, drunkenness, and repeated negligence; as to the number of hours (40) which constitute a work week; overtime pay, and vacation with pay. Prior to the expiration of the contract the union notified the employer of its desire to negotiate a new agreement, and proposed extensive changes. In addition to asking sweeping raises in pay, which averaged 32 cents, it proposed that 48 hours, instead of 40, should constitute a work week and that all work in excess of 40 hours in any one week (that is, 8 hours) should receive time and a half at the regular hourly rate of pay. It proposed that employees with three years of service should receive two weeks vacation with full pay instead of one; that a union shop and the checkoff should be established. Bargaining conferences were held at eight different times between May 21 and August 18, 1948. On August 3 the employer offered to increase the hourly wage rates 10 cents per hour, at the same time deleting all seniority provisions from the old contract. The Board found that this proposal was limited to the seniority article in the contract which provided that seniority should govern layoffs and rehirings. There is no evidence in the record to support this finding; in fact it is positively contradicted by the evidence not only of the employer, but by Alsten, representative of the union, who testified that under the employer's proposal the seniority provisions of the original contract were to be deleted, leaving no seniority clause at all.

This offer by the employer would have boosted the starting rate to 87 cents an hour, and under the undisputed testimony would have raised the permanent rate to 98 cents an hour. The union did not recede from its demands until August 18, when Alsten proposed a 10 cents an hour increase; two weeks vacation; a guaranty of a 45⅓ hour week with 5⅓ hours at overtime rate; seniority; holiday pay; a settlement retroactive to June 1, 1948. This proposal was not accepted by the employer. The union made no attempt to negotiate with the employer after August 18, and instituted a strike on August 27.

The trial examiner found that this was an economic strike, and that the union elected to depend upon its economic strength in enforcing its demands. The Board approved this finding, for it declared that the union called a strike on August 27, following an impasse, "to enforce its demands." The union made no attempt to contact the employer before the strike.

All 13 employees in the unit involved participated in the strike. Immediately after the strike the employer began to seek replacements at the rate of 98 cents an hour. Within two or three days a sufficient crew of replacements had been recruited and the employer resumed normal operations. On September 8 the employer repeated to the union its offer of August 3, including 98 cents an hour for permanent work, a year's contract, the 40-hour work week, and vacation with pay. The union rejected the offer.

On October 8 the employer filed a petition with the Board requesting an election to determine whether the union represented a majority of the employees, and the union then filed the instant charge. On February 23, 1949, the strikers voted to ask Alsten to "get us all reinstated as a body." On February 28 the union wrote the employer making "unconditional application for reinstatement and reemployment." The company replied that if any vacancy should occur it would consider without discrimination the reemployment of the strikers. Between March 25 and March 31, 1949, each one of the strikers was offered reemployment on the same basis as the

replacements. With the exception of one man who did not reply, the strikers individually rejected the employer's offer of reinstatement, upon the ground that they would have to be released by the union.

On hearing of the charge and the amended charge, the trial examiner found that the employer had not engaged in the unfair practices alleged. The Board adopted the findings and conclusions of the trial examiner in part, agreeing with him that "up to about August 30, 1948, the Respondent [employer] did not refuse to bargain collectively with the Union as the representative of its employees in an appropriate unit." The Board found that the employer thereafter had refused to bargain collectively in good faith in several respects:

"(a) On and after August 30, if not before, by bypassing the Union and individually offering old and new employees a higher wage rate than it had offered the Union, as the exclusive statutory representative; and on September 8 by again offering the Union a rate lower than it was actually offering to individuals. Nor is it a defense that the Respondent's [employer's] employees were then on strike. On August 30, the strike was still current, a majority of the strikers had not been replaced, and the Union retained its status. With respect to wages and other terms and conditions of employment, the Respondent [employer] thus remained 'legally obligated to continue to bargain with the Union.' Moreover, a loss of majority thereafter, following the unfair labor practices, is no defense to a refusal to bargain.

"(b) On October 12, by questioning the Union's majority, withdrawing recognition, and refusing to recognize the Union unless and until its majority was reestablished in a Board election."

The employer contends that the material findings of the Board are not supported by substantial evidence upon the record considered as a whole; that the case is governed by the Supreme Court's decision in National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381, and Times Publishing Co. 1947, 72 N.R.L.B. 676 (No. 128).

It contends that under the authorities it is guilty of no unfair labor practice, and that it did not prolong the strike. The Board contends that its findings are correct and that the case falls within the ambit of National Labor Relations Board v. Crompton Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320; National Labor Relations Board v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, certiorari denied, 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549; Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788; and National Labor Relations Board v. J. H. Allison & Co., 6 Cir., 165 F.2d 766, 3 A.L.R. 2d 990, certiorari denied, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369.

The Mackay case involved a strike situation in which the employer hired replacements in order to continue the operation of the business. The Supreme Court, with reference to this hiring, declared: "Nor was it an unfair labor practice to replace the striking employes with others in an effort to carry on the business. Although section 13 provides, 'Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike,' it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled. [304 U.S. 333, 58 S.Ct. 910]"

In the Crompton Highland Mills case, no strike was involved and there was no hiring of replacements in order to continue operation of the business. The employer, without consulting the union, made general increases in wages to individual employees, and this was held to be a violation of the

statute. The Supreme Court in that case recognized and differentiated, 337 U.S. at page 224, 69 S.Ct. at page 963, 93 L.Ed. 1320, the situation where there is a unilateral grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining but has been left unaccepted or even rejected in those negotiations.

In the Reed & Prince Mfg. Co. case, supra [118 F.2d 886], the court pointed out that the case was not one where the employer hired replacements, the strike not having been provoked by any antecedent unfair labor practice, and declared that the respondent "continued to treat the strikers as its employees and exerted itself to stampede the employees back to work."

If the employer's contention is correct, that the facts of the instant case place it within the line of cases governed by the Mackay case, then enforcement must be denied, for the Mackay case states established law. Cf. National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660. The Board followed the rule of the Mackay case in Times Publishing Co., 72 N.L.R.B. 676, in which it stated that when replacements are legally hired during the course of a strike, the employer need not negotiate with the union the conditions under which new employees are to be hired to replace the striker, and continued: "So to hold would be to nullify the respondent's right to hire replacements."

■ Our examination of the record, considered as a whole, bearing in mind the probative force of the Board's findings, shows that its conclusions of fact are not supported by the evidence. The employer had recognized and bargained with the union and both the trial examiner and the Board found that up to August 30 no unfair labor practice existed. The union's agent, Alsten, testified that after the strike occurred he made no attempt to contact the employer. The employer is entitled to have its conduct considered in the light of this history, with its complete absence of hostility to the union. National

Labor Relations Board v. Penokee Veneer Co., 7 Cir., 168 F.2d 868, 4 A.L.R.2d 1350; National Labor Relations Board v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602; National Labor Relations Board v. Kingston, 6 Cir., 172 F.2d 771, 774.

There is no testimony supporting a number of the material findings of fact upon which the order is based. The record contains neither testimony nor evidence from which any inference could be drawn that the employer hired replacements, as the Board found, to break the strike. It is undisputed on this record that the employer hired replacements in order to continue business.

The Board found that the employer individually offered old employees a higher wage rate than it had offered the union. Of the places filled immediately all were taken by men not members of the union. Seven of the 13 places filled in the two or three days around August 27 had been held by men who were being paid the permanent rate of 88 cents. The finding of the Board that the offer of 98 cents was substantially greater than that which had been offered to the union is in large measure incorrect under the conceded facts, for as to seven of the 13 men replaced the employer's offer of a ten cent increase was exactly the wage rate that had been offered to them through the union.

■ It is also undisputed that the work was seasonal and that four of the men working at the time of the strike were summer employees. They received the starting rate of 77 cents. Four nonunion replacements were substitutes who received 98 cents. This was not a violation of the statute. There is no requirement of law that the employer who rightfully hires replacements to continue his business after a strike should offer the replacements the same rate which has been offered the union. Moreover, the parties paid no attention to the starting rate in their negotiations. Neither Corbell, for the employer, nor Alsten and Tubman, the witnesses for the union, the only persons who testified as to negotiations over the contract, mentioned the starting rate. The written union demands for raises were based on the perman-

ent rate of 88 cents. Apart from the raise in wages asked, the principal issues between the union and the employer were seniority, the length of the work week, and the amount of overtime guaranteed. Alsten said the union could consider the ten cents increase only in the event that they were to be guaranteed the work week demanded by the union. How important this was financially is shown by Corbell's statement that the difference in the work week would amount to $387 a year on the 88 cent rate.

The finding that the offer of 98 cents made to replacements after the strike was higher than that made to the union on August 15, and repeated on September 8, ignores the fact that the flat 98 cent rate which was all that was offered the replacements included no right of seniority or vacation with pay, no provision as to the length of the work week, as to overtime, arbitration, and none of the other valuable features of the contract. On the conceded facts the offer made to the union was much more advantageous than that made to the replacements.

There is no evidence in the record supporting the Board's findings that the employer's offer of August 30 was made to the old employees. The employer addressed no letters, no telephone communications, and had no contact with the strikers either individually or collectively, except in the renewal of the offer of August 18 made to the union on September 8. All of the 13 places were in fact filled by nonunion men within a few days after August 27. Four old employees secured reemployment prior to the union's letter of February 28, 1949, demanding reinstatement for the members of the union. Smart was rehired on September 10, Kelly on September 20, Edwards on November 8, Lounds on February 28. It is undisputed that each of these men solicited reemployment, and the subject of the union was not discussed with them, so that it could hardly be said that the employer had "exerted itself to stampede the employees back to work." National Labor Relations Board v. Reed & Prince Mfg. Co., supra. All union members were offered reemployment in order of seniority after the union wrote its letter of February 28, 1949, and only after that time.

■ Since the employer sought replacements not among the strikers, but among workmen generally, and since the strike was caused by no unfair labor practice, there is no evidence supporting the Board's finding that a unilateral offer was made to the employees and the union, on the undisputed facts, was not by-passed. The Crompton Highland Mills case, supra, does not govern this case. In the cited case, Order of Railroad Telegraphers v. Railway Express Agency, Inc., supra, and National Labor Relations Board v. J. H. Allison & Co., supra, there was no strike involved, and the problem presented was essentially different. Here, since the offer to the replacements was not substantially greater than that offered the union; and since it was given, not to the employees, but to the public at large; and since the employer, when the strike occurred, as found by the Board, was "guilty of no act denounced by the statute", National Labor Relations Board v. Mackay Radio & Telegraph Co., supra [304 U.S. 333, 58 S.Ct. 911], it had a right to replace the striking employees with others in an effort to carry on the business.

This was the specific holding of the Supreme Court in National Labor Relations Board v. Columbian Stamping & Enameling Co., supra, which also involved a strike situation. There the employer hired replacements, and, as was the fact in the instant case, secured a full complement of production employees. The Supreme Court held that there was no duty to bargain with the union after a full complement of replacements had been secured.

There is no evidence that the strike was prolonged by the employer. In its letter of February 28, 1949, the union asked for "unconditional" reemployment for the men. The employer offered each of the unemployed strikers employment. None of them accepted the offer. Six of them testified that they refused the offer unless a release was given by the union, that is, as some of the men explained it, unless the strikers should come back in a body. There was no

testimony to the contrary. But the employer was under no obligation to discharge the replacements in order to substitute the strikers. National Labor Relations Board v. Mackay Radio & Telegraph Co., supra. The request of the union was in fact not unconditional, for it imposed the approval of the union as a condition upon the employer. It is to be noted that the unfair labor practice found to exist in the Mackay case was discrimination in the reinstatement of certain strikers because of their union activity. Such a violation of the statute is not charged in the instant case.

The request for enforcement of the order is denied. The decision and order of the Board are set aside and the complaint is dismissed.